**In re USN COMMUNICATIONS, INC., et al., Debtors.**

**Scott Peltz, as Trustee of the USN Communications Liquidating Trust, Plaintiff,**

**v.**

**Worldnet Corporation, Defendant.**

**Bankruptcy Nos. 99–383 to 99–395(PJW). Adversary No. 00–1948.**

United States Bankruptcy Court, D. Delaware.

June 27, 2002.

Mark Minuti, Tara L. Lattomus, Saul Ewing, LLP, Wilmington, DE, David B.

Horoff, Frank W. DiCastri, Foley & Lardner, Chicago, IL, for Scott Peltz, Liquidating Trustee.

Charlene D. Davis, Ashley Stitzer, The Bayard Firm, Wilmington, DE, Kenneth A. Michaels, Jr. Bauch & Michaels, Chicago, IL, for Worldnet Corporation.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

This is the Court's ruling following the trial on a complaint ("Complaint") by Scott Peltz ("Plaintiff" or "Trustee"), Trustee for the USN Communications Liquidating Trust, against Worldnet Corporation ("Worldnet" or "Defendant") to recover avoidable transfers.[1] For the reasons discussed below, I will find in favor of Plaintiff.

## BACKGROUND

Worldnet is in the business of providing highly skilled computer, information and communication systems consultants to its customers. (Stipulated Pre–Trial Order (Doc. # 37) ("Pre–Trial Order") ¶ 10.) Prior to February 18, 1999 ("Petition Date"), Worldnet provided three such consultants to USN Communications, Inc. ("USN" or "Debtor"): John Jackson ("Jackson"), Brian Weith ("Weith") and Lee Strauss (collectively, the "Consultants"). (Id.)[2] At all times relevant to the instant dispute, Weith and Jackson were the only Consultants continuing to provide services to USN. (Transcript of March 12, 2002 Trial (Doc. # 40) ("Trans.") at 58.)

Although some of the consultants that Worldnet provides to its customers are

---

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. Although not relevant to the instant dispute, Weith performed services for USN subsequent to the Petition Date as well. (Pre–Trial Order ¶ 10.)

employees of Worldnet (*id.* at 29), both Weith and Jackson were "independent" consultants engaged by Worldnet solely for the purpose of providing services to USN (*id.* at 31, 58). Neither was on Worldnet's payroll as an "employee". (*Id.* at 31.) Worldnet had a written agreement ("Weith Agreement") with Weith with respect to the terms of his employment at USN (Pre–Trial Order ¶ 11); however, no written document has been found evidencing the terms of Worldnet's agreement with Jackson.[3] The substance of the Weith Agreement provides in full:

> This letter is intended to confirm our understanding of the Delphi assignment at *USN where you were accepted through Worldnet's representation.* You will begin this project on December 1, 1997. At that time it is expected that this assignment will be your full-time endeavor. *It is understood that you will provide Worldnet with your corporation name, taxpayer I.D number, and that no employment relationship shall exist between you and Worldnet.*
>
> *Worldnet will pay your company sixty ($60) dollars per hour for your services.* Payment will be made strictly on the basis of timesheets signed by *USN's* project leader. *Worldnet* invoices twice a month for hours billed from the first of the month through the fifteenth of the month, and secondly, for hours billed from the sixteenth through the end of each month. *Payment will be made for your services 30 days after the date of invoicing.*
>
> It is understood that you will perform to the best of your ability at all times on this assignment. *You agree not to attempt to place either directly or through a third party, yourself or any consultant into USN for one year after termination of this assignment, except through Worldnet's representation. In leaving this assignment a two week notice will be required from you.*
>
> We are pleased with the prospects of mutual success on this USN account, and look forward to a prosperous relationship in the future.

(Weith Agreement, Def.'s Group Ex. 1, Doc. # 239) (underlined emphasis added.)

There is no written contract evidencing the terms of Worldnet's agreement with USN with respect to the Consultants' services. (Trans. at 38.) However, the Court's understanding of the parties' agreement and/or their course of dealing is as follows:[4]

The Consultants would work at USN's premises in Chicago and be supervised by Kevin Hopp, USN's project leader ("Project Leader"). (*Id.* at 33–34.) The Con-

---

**3.** Nevertheless, when shown a copy of the Weith Agreement at trial, James McBride, the founder and managing principal of Worldnet, characterized the agreement as "an agreement that we make with consultants that are independent that are not our permanent employees" and testified that there should be an agreement between Worldnet and Jackson as well. (Trans. at 44–45.) Presumably, the terms of Worldnet's agreement with Jackson are similar to those contained in the Weith Agreement.

**4.** The Court's understanding of the terms of the parties' agreement is based upon: (1) the facts stipulated to by the parties in the Pre–Trial Order (Doc. # 37); (2) testimony provided at the trial by Mr. McBride (Trans. at 29–70); (3) that portion of the deposition testimony of Laura Fiala, the Finance Manager of Worldnet, that was read into the record at trial (*id.* at 73–88); and (4) the terms of the Weith Agreement (Def.'s Group Ex. 1, Doc. # 239). The actual terms of Worldnet's agreement with USN were negotiated by USN and one of Worldnet's sales representatives. (Trans. at 54.) Mr. McBride participated in the negotiations solely to the extent of hearing proposed rates for the Consultants' services and either agreeing or disagreeing to such rates. (*Id.* at 54–55.)

sultants would do the work that the Project Leader told them to do and USN could terminate the Consultants' services whenever it wanted.[5] (*Id.* at 33, 42.) USN had no direct contract with any of the Consultants, and none of the Consultants ever attempted to collect their fees directly from USN. (Pre–Trial Order ¶ 12.) Rather, the Consultants had separate agreements with Worldnet, pursuant to which Worldnet would pay the Consultants for services performed for USN. (*Id.* at ¶ 11; *see* Weith Agreement *supra,* pp. 3–4.) The Project Leader would sign timesheets showing all of the hours worked by the Consultants and forward the timesheets to Worldnet. (Trans. at 34, 36.) Based on those timesheets, Worldnet would invoice USN twice per month, charging USN on a time and material basis based on the hours actually worked by the Consultants. (*Id.* at 36–37.) USN would then pay Worldnet for the Consultants' work (*id.* at 34), and Worldnet would pay the Consultants pursuant to the terms of the agreements Worldnet had with such Consultants, retaining a portion of the amount received from USN as payment for its own involvement in the transaction (*id.* at 37). The rate at which the Consultants were paid was established by agreement between Worldnet and the Consultants. (*Id.* at 61.) In addition, there was no indemnification agreement between Worldnet and USN with respect to the Consultants' fees. (Trans. at 44.)

Worldnet did not always wait to receive payment from USN before paying the Consultants. (Pre–Trial Order ¶ 13.) In fact, Worldnet did not usually receive payment from USN before making such payments. (*Id.*) Normally, Worldnet pays its consultants prior to receiving payment from the customer because it is obligated to do so pursuant to its agreements with the consultants, regardless of whether Worldnet has received payment from the relevant customer. (*Id.* at ¶ 14; Trans. at 59–60.) After paying the consultants, Worldnet does not record the payments as "accounts receivable" from its customers because such payments are accounts payable. (Pre–Trial Order ¶ 15; Trans. at 81.) The value of the services provided by the consultants is included in the invoices Worldnet sends to its customers. (Pre–Trial Order ¶ 15.)

Although Worldnet's payments to the Consultants were normally not dependent on whether Worldnet had received payment from USN (Pre–Trial Order ¶ 13), there were times when, due to cash flow issues, Worldnet delayed paying at least one of the Consultants because it had not received payment from USN. (Trans. at 43, 60, 83, 86–87.) In fact, at one time, Jackson retained the services of an attorney to collect fees from Worldnet after Worldnet fell behind in paying Jackson for his services at USN. (*Id.* at 49, 43.)[6] Neither Jackson nor his attorney ever attempted to collect such fees directly from USN. Ultimately, Worldnet paid all of the Consultants in full for all services performed at USN. (*Id.* at 43, 83.)[7]

---

5. Mr. McBride's understanding that USN could terminate the Consultants' services whenever it wanted is based upon industry practice. (Trans. at 42.) In fact, USN ultimately terminated the services of both Jackson and Lee Strauss. (*Id.*)

6. In her deposition, read into the record at trial, Ms. Fiala testified that Worldnet fell behind in paying Jackson because of cash

flow problems and not because its payment to Jackson was contingent upon receiving payment from USN. (Trans. at 86.)

7. Payments for Weith's services were made to Interactics Corporation ("Interactics"), and payments for Jackson's services were typically made to LWE Research ("LWE"). (Trans. at 47.) Interactics and LWE are Weith's and Jackson's respective corporations. (*Id.*)

On February 18, 1999 ("Petition Date") USN and certain of its subsidiaries and affiliates (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. (Pre–Trial Order ¶ 3.) Upon filing for bankruptcy, USN scheduled a $53,819.75 liability in Worldnet's favor that is unsecured, non-priority, non-contingent, liquidated, and undisputed. (*Id.*) Worldnet did not file a proof of claim. (*Id.*)

On February 2, 2000, Debtors filed their Disclosure Statement ("Disclosure Statement") and a copy of their First Amended Joint Plan of Reorganization (the "Plan") with the Court. (*Id.* at ¶ 5.) As a creditor of USN, Worldnet received a copy of both the Disclosure Statement and Plan. (*Id.*) The Disclosure Statement informed the unsecured creditors that their estimated recovery under the Plan would be approximately 1.7–11.4% of the total amount of their claims. (Pre–Trial Order ¶ 6.) As an unsecured creditor of USN, Worldnet was included in the Plan as a member of Class 4. (*Id.* at ¶ 8). Because Class 4 claims are impaired, Worldnet was entitled to vote on the Plan. (Plan § 4.4.) However, Worldnet did not do so. (Pre–Trial Order ¶ 8.) In addition, Worldnet neither raised any objections to the Plan or Disclosure Statement, nor sent a representative and/or attorney to the Disclosure Statement or Plan confirmation hearings to appear on its behalf. (Trans. at 62–63.) The Disclosure Statement was approved by Order (Doc. # 576, Case No. 99–383) of this Court on February 4, 2000, and the Plan was confirmed on March 15, 2000 (*see* Order (Doc. # 624, Case No. 99–383) ("Confirmation Order")).

On the Effective Date of the Plan, pursuant to the terms of the Plan, the Confirmation Order, and the liquidating trust agreement executed in connection therewith ("Liquidating Trust Agreement"), the USN Communications Liquidating Trust was formed "for the sole purpose of liquidating the Liquidating Trust Assets". (Plan (Doc. # 588) § 9.11(b).) The Liquidating Trust Assets ("Assets") are defined in the Plan as "all Residual Assets once transferred into the Liquidating Trust, and any and all proceeds thereof and interest accruing with respect thereto." (*Id.* at § 1.110.) The Assets include all Avoidance Claims, defined in the Plan as "all claims, rights and causes of action assertable by the Debtors or their successor(s), *including, but not limited to, an action brought under Sections 541, 542, 543, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code* " (*id.* at § 1.19) (emphasis added), and all Litigation Claims, defined in the Plan as:

> any claim, right, cause of action, counterclaim or set off right of the Debtors, the Estates or the Liquidating Trust, *including, without limitation, any Avoidance Claim*, Hatten Transaction Claim or Hatten Fiduciary Claim, other than any claim, right, cause of action, counterclaim or set off right which has been waived, released, discharged or otherwise limited pursuant to the Plan, the Confirmation Order or another Bankruptcy Court order in the Reorganization Cases (*id.* at §§ 1.112) (emphasis added).

(*Id.* at § 1.133).

Pursuant to the terms of the Plan, the Liquidating Trust, through the Liquidating Trustee, has the power to collect and liquidate all of the Assets, distribute the proceeds of the Assets in accordance with the terms of the Plan, and take any additional steps reasonably necessary to accomplish these tasks. (Plan § 9.11(b).) In addition, the Plan provides that:

> the Liquidating Trust shall succeed to all of the rights of the Debtors necessary to protect, conserve and liquidate all Liquidating Trust Assets as quickly as reasonably practicable. In that ca-

pacity, the Liquidating Trust shall have the exclusive power, on behalf and in the name of the Debtors, to prosecute, defend, compromise, settle and otherwise deal with all such Liquidating Trust Assets subject to the restrictions of the Liquidating Trust Agreement, this Plan and the Confirmation Order; *provided, however,* that the Liquidating Trustee shall have no right to use the Liquidating Trust Assets to conduct trade or business.

(*Id.* at § 9.11(c).) Section 12.10 of the Plan, entitled **"Retention and Enforcement of Claims and Equity Interests"** (emphasis in original), further provides:

> Upon the occurrence of the Effective Date, pursuant to Section 1123(b)(3) of the Bankruptcy Code, except as provided herein, *the Liquidating Trust will have the exclusive right to enforce any and all causes of action against any Person and rights of the Debtors that arose before or after the Petition Date,* including but not limited to the rights and powers of a trustee and debtor-in-possession, against any Person whatsoever, *including but not limited to all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code.*

(*Id.* at § 12.10) (emphasis added).[8]

In addition, § 12.8 of the Plan, entitled **"Preservation of Certain Claims"** (emphasis in original), also provides:

Nothing in this Article 12 of the Plan shall discharge, release, limit or impair the right of:

(a) the Debtors or Liquidating Trust in respect of: **(i) any claim, right or cause of action against any Person arising out [sic] such Person's willful misconduct or intentional fraud; (ii) any Avoidance Claim against any Person, other than a Retained Professional;** and (iii) any claim, cause of action, right, title and interest of the Debtors or the Liquidating Trust arising under or related to the Purchase Agreement (or an Alternative Purchase Agreement, as the case may be), including, without limitation, the right to receive the Purchase Consideration (or the Alternative Purchase Consideration, as the case may be);

(b) the plaintiffs and the members of the class they represent in the Securities Suit against any defendant named in the Consolidated Class Action Complaint, dated June 17, 1999, filed in the Securities Suit or in the companion suit captioned *Priesmeyer v. Chase Venture Capital Associates L.P. et al.,* Civ. No. 99–7145, pending in the United States District Court for the Northern District of Illinois, other than as against (i) the Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications and (ii) if Class 5 by the court-appointed class representatives in the Securities Suit votes to accept the Plan

---

**8.** The Disclosure Statement contains a similar provision:

> Upon the occurrence of the Effective Date, pursuant to Section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, *the Liquidating Trust will have the exclusive right to enforce any and all causes of action against any Person and rights of the Debtors that arose before or after the Petition Date,* including but not limited

to the rights and powers of a trustee and debtor-in-possession, against any Person whomsoever, *including but not limited to all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code.*

(Disclosure Statement at 69) (emphasis added).

and the Securities Litigation Settlement is approved by the court before which the Securities Suit is pending, then the Individual Class Action Defendants; and

(c) any holder of a Subordinated Securities Claim against any **Person** other than Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications.

(d) **Bell Atlantic, Bell Atlantic—New York, Bell Atlantic—Massachusetts, Bell Atlantic—Maine, Bell Atlantic—Rhode Island, Bell Atlantic—New Hampshire, Bell Atlantic—New Jersey, Inc., Bell Atlantic—Virginia, Inc., Bell Atlantic—Washington, D.C., Inc., Bell Atlantic—Pennsylvania, Inc., Bell Atlantic—Maryland, Inc., Bell Atlantic—West Virginia, Inc., and Bell Atlantic—Delaware, Inc. against any Person other than the Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications**

(e) **the United States against any Person other than the Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications.**

(Confirmation Order (Doc. # 624) at 16) (emphasis added). The emphasized portions of this section constitute modifications to the Plan made in the proposed order of confirmation submitted by the Plan proponents subsequent to the Plan's acceptance, but prior to its confirmation.[9]

On April 5, 2000, pursuant to the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, Plaintiff was appointed as Liquidating Trustee ("Trustee") for the USN Communications Liquidating Trust ("Trust"). (Pre–Trial Order ¶ 9.) Thereafter, on December 15, 2000, Plaintiff commenced the instant action against Worldnet seeking: (i) to avoid alleged preferential Transfers ("Alleged Transfers") pursuant to 11 U.S.C. §§ 547[10]; and (ii) to recover the value of

9. Prior to its modification, § 12.8 provided: Nothing in this Article 12 of the Plan shall discharge, release, limit or impair the right of:

(a) the Debtors or Liquidating Trust in respect of: (i) any Hatten Fiduciary Claim against any current or former officer or director; *provided, however,* no current or former officer or director shall have liability in excess of the Available D & O Insurance Proceeds to any Person (including, without limitation, the Debtors, the Estates and/or the Liquidating Trust) arising out of or related to any Hatten Fiduciary Claim; and (ii) any claim, cause of action, right, title and interest of the Debtors or the Liquidating Trust arising under or related to the Purchase Agreement (or an Alternative Purchase Agreement, as the case may be), including, without limitation, the right to receive the Purchase Consideration (or the Alternative Purchase Consideration, as the case may be);

(b) the plaintiffs and the members of the class they represent in the Securities Suit against any defendant named in the Consolidated Class Action Complaint, dated June 17, 1999, filed in the Securities Suit or in the companion suit captioned *Priesmeyer v. Chase Venture Capital Associates L.P. et al.,* Civ. No. 99–7145, pending in the United States District Court for the Northern District of Illinois, other than as against (i) the Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications and (ii) if Class 5 by the court-appointed class representatives in the Securities Suit votes to accept the Plan and the Securities Litigation Settlement is approved by the court before which the Securities Suit is pending, then the Individual Class Action Defendants; and

(c) any holder of a Subordinated Securities Claim against any Entity other than Debtors, the Estates, the Liquidating Trust and Reorganized USN Communications. (Plan § 12.8; Disclosure Statement at 68–69.)

10. 11 U.S.C. § 547 provides in pertinent part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;

such transfers pursuant to 11 U.S.C. § 550 [11]. (*Id.* at ¶ 1.) [12] In addition, Plaintiff now seeks to recover both pre– and post-judgment interest on the recovered amount of Alleged Transfers. (Pl.'s Br. (Doc. # 41) at 35–38.) [13]

## DISCUSSION

A transfer is avoidable under § 547(b) if such transfer: (1) was to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made on or within 90 days preceding the petition date, or on or within one year of the petition date if the transferee was an insider at the time of the transfer, and (5) enables the creditor to receive more than it would have received in a chapter 7 liquidation had the transfer not been made. 11 U.S.C. § 547(b) (2001–02). Defendant does not

dispute that the Alleged Transfers satisfy the first, second, fourth and fifth requirements for avoidability under § 547(b). (*See* Pre–Trial Order ¶ 18; Trans. at 7.) The Alleged Transfers were made to or for the benefit of Defendant on account of an antecedent debt within ninety days prior to the Petition Date. (Pre–Trial Order ¶ 18.) In addition, the Alleged Transfers enabled Defendant to receive more than it would have in a chapter 7 liquidation had the transfers never been made. (Trans. at 7.) Thus, the only remaining issue for determining avoidability under § 547(b) is whether the Alleged Transfers were made while Debtor was insolvent. Defendant contends that they were not. (Trans. at 12; Def.'s Br. (Doc. # 43) at 5–7.) [14]

In addition, Defendant also contends that even if the Alleged Transfers are

> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11. U.S.C. § 550 provides:
> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

12. Originally, Plaintiff sought to recover Alleged Transfers in an amount equal to $75,000.00. However, due, in part, to certain concessions made by each of the parties prior to trial, *see* discussion *infra*, n. 14, Plaintiff now seeks to recover Alleged Transfers in an amount equal to $53,726.00. (Trans. at 11.)

13. 11 U.S.C. §§ 101 *et seq.* is hereinafter referred to as "§ __".

14. As discussed above in footnote 12, Plaintiff originally sought to recover $75,000.00 consisting of three Alleged Transfers, each in an amount equal to $25,000.00. Originally, Defendant argued that none of the three Alleged Transfers were made while the Debtor was insolvent. However, in exchange for Plaintiff's concession that Defendant provided Debtor with $21,274.00 of subsequent new value pursuant to § 547(c)(4), Defendant now concedes that the last $25,000.00 transfer was made while the Debtor was insolvent and is therefore avoidable and recoverable pursuant to §§ 547(b) and 550. (Trans. at 8, 13.)

avoidable under § 547(b), the instant action must fail because: (1) it is barred by confirmation of the Plan under the doctrine of *res judicata* (Def.'s Br. (Doc. # 43) at 7–9); (2) the Plan and Disclosure Statement failed to adequately preserve Plaintiff's right to bring this action post-confirmation (*id.* at 9–14); (3) the post-acceptance/pre-confirmation modification to § 12.8 of the Plan without notice to all creditors constitutes an admission that the Plan, as submitted for solicitation of votes, failed to preserve any post-confirmation preference actions and is void for lack of notice and its failure to comply with bankruptcy law and the requirements of constitutional due process (*id.* at 14–16); (4) Defendant provided Debtor with new value subsequent to Defendant's receipt of the Alleged Transfers in accordance with § 547(c)(4) [15] (*id.* at 16–20); [16] and (5) Plaintiff has breached his fiduciary duty to the Trust and to Defendant as a beneficiary thereof by failing to exercise care, diligence and skill in deciding which claims to prosecute and how far to proceed in pursuing the instant action after "it became reasonably obvious that further litigation against Worldnet would cost more than it was likely to bring into the estate" (*id.* at 20–25). In addition, Defendant disputes

Plaintiff's argument that, if successful in this action, Plaintiff is entitled to recover prejudgment interest on the Alleged Transfers. (Def.'s Br. (Doc. # 43) at 25.) I will address each of these arguments separately.

### I. Debtors' Insolvency at the Time the Alleged Transfers Took Place

Defendant first argues that the Alleged Transfers are not avoidable under § 547(b) because they were not "made while the debtor was insolvent" pursuant to § 547(b)(3). (Trans. at 12; Def.'s Br. (Doc. # 43) at 5–7.) I disagree.

 Plaintiff has the burden of demonstrating that the Alleged Transfers were "made while the debtor was insolvent". *See* 11 U.S.C. § 547(g) [17]. In meeting this burden, however, Plaintiff is afforded the benefit of the presumption contained in § 547(f) which provides that "[f]or the purposes of [§ 547], the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f); *see also Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 456, 458 (Bankr.D.Del.2002). Therefore, unless

---

15. Section 547(c)(4) provides:

(c) The trustee may not avoid under this section a transfer—
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

16. The Stipulated Pre–Trial Order (Doc. # 37) provides that "Worldnet extended new value to USN Communications or for the benefit of USN Communications subsequent to the re-

ceipt of the transfers to the extent of all but $9,057.25." (*Id.* at ¶ 54(b)). Thus, Worldnet has admitted to liability on the Alleged Transfers of at least $9,057.25 in the event that its arguments/defenses are unsuccessful. *See also* Def.'s Br. (Doc. # 43) at 18 ("Worldnet has argued ... that Worldnet would have a total exposure of $9,057.25.").

17. Section 547(g) provides:

For the purposes of this section, the trustee has the burden of proving avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

Defendant introduces some evidence showing that Debtor was solvent at the time the Alleged Transfers took place, Plaintiff's burden has been met and the Alleged Transfers will be avoidable under § 547(b). See *Fiber–Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 150 B.R. 608, 614 (E.D.Pa. 1993); *In re Bros. Gourmet Coffees*, 271 B.R. at 458.[18]

■ The only evidence submitted by Defendant in support of its argument that Debtor was solvent at the time the Alleged Transfers took place is a Form 8–K Statement ("Form 8–K") filed by Debtors with the Securities and Exchange Commission ("SEC") on January 20, 1999, approximately one month prior to the Petition Date. (Trans. at 21–24.) The Form 8–K provides in pertinent part:

> The Company has substantial current and ongoing cash needs with respect to both its operations and the maturity of the New 17% Notes on February 15, 1999. While the Company has generally been meeting new obligations incurred by the Company since November 1998 in the ordinary course of business from working capital infusions and cash flow, the Company's recent cash position has resulted in the Company's deferral of payment of certain of its past obligations. *The absence of additional capital infusions in the very near term will result in the Company's inability to meet its current and future obligations as they become due, prevent the Company from making payment arrangements with respect to, or otherwise servicing, any material amount of its past-due obligations, raise substantial doubt about the Company's ability to continue as a going concern and may require the Company to seek protection under applicable bankruptcy laws.*

(Form 8–K, App. to Pl.'s Br. (Doc. # 42) Ex. G at 2–3) (emphasis added). In addition, the first paragraph of the Form 8–K references a $10 million, 17% interest-bearing note that was given to Merrill Lynch Global Allocation Fund on November 18, 1998, approximately one week prior to the date the first Alleged Transfer took place. (*Id.* at 2.) Defendant argues that this evidence is sufficient to rebut the presumption that Debtor was insolvent at the time the Alleged Transfers took place in November 1998 and January 1999. (Def.'s Br. (Doc. # 43) at 6–7.) As such, Defendant argues, the Court should compel Plaintiff to go forward with its burden of proving Debtor's insolvency under § 547(b)(3)(B). (*Id.*) I disagree.

■ First, there is no case law that supports Defendant's contention that the subject statement in the Form 8–K is, alone, sufficient to rebut the presumption of Debtors' insolvency.[19] In addition, for

---

18. At the trial, counsel for the Defendant stated that he hoped the evidence presented by Defendant would show that Plaintiff did not conduct an insolvency analysis, but rather, relied solely on the presumption contained in § 547(f). (Trans. at 12.) However, as discussed above, Plaintiff is entitled to rely on the presumption and it is upon Defendant to present evidence sufficient to rebut the presumption before Plaintiff is required to go forward with his burden.

19. Defendant acknowledges that it "could not find any case on point addressing whether admissions contained in an SEC filing are sufficient to compel the Debtor to go forward with his burden of proof," but cites *Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 456 (Bankr.D.Del.2002) in support of its position. (Def.'s Br. (Doc. # 43) at 6.) I find that case to be inapposite. In *Bros. Gourmet Coffees*, this Court was faced with a summary judgment motion in which the Defendant argued that: (1) the debtor was not insolvent at the time certain alleged preferential transfers were made; and (2) even if the debtor was insolvent at the time the transfers were made,

the purposes of bankruptcy, a debtor is "insolvent" when the sum of its liabilities exceeds the sum of its assets. 11 U.S.C. § 101(32)[20]; *see also* 5 COLLIER ON BANKRUPTCY ¶ 547.03[5] at 547–37 – 547–38 (15th Ed.2001) ("A debtor that is unable to pay its debts as they mature is thus not necessarily insolvent for purposes of a preference action."). Therefore, the fact that the Form 8–K states that "the Company has *generally* been meeting new obligations incurred by the Company since November 1998 in the ordinary course of business" does not support a finding of Debtor's solvency for the purposes of § 547. Nothing contained in the Form 8–K suggests that the Debtors' assets exceeded their liabilities at the time the Alleged Transfers took place and indeed, the portion of the statement underlined above suggests the

the transfers fell into the "ordinary course of business" exception contained in § 547(c)(2). 271 B.R. at 458. With respect to its first argument, the Defendant presented *expert testimony* to rebut the § 547(f) presumption of debtor's insolvency. *Id.* After the debtor responded by offering portions of an affidavit of its chief financial officer, citations to its SEC Form 10–Q prepared two months prior to the petition date, *and* references to its disclosure statement, the Court found that sufficient issues of material fact existed to preclude summary judgment on the matter. *Id.* at 459. However, upon subsequently finding that the alleged transfers were, in fact, made in the "ordinary course of business" pursuant to § 547(c)(2), the Court ultimately found that "whether or not Debtor was insolvent on the dates of the allegedly preferential transfers need not be determined." *Id.* at 462.

The situation in *Bros. Gourmet Coffees* is very different from the one at bar. Although at the trial, counsel for Defendant acknowledged "that insolvency requires expert testimony" (Trans. at 12), in contrast to the situation in *Bros. Gourmet Coffees*, Defendant has presented no expert testimony to rebut the presumption of Debtor's insolvency. In addition, where the debtor in *Bros. Gourmet Coffees* responded to Defendant's expert testimony with portions of an affidavit, citations from its disclosure statement, *and* an SEC Form

opposite. (*See* Form 8–K, App. to Pl.'s Br. (Doc. # 42) Ex. G at 2–3.) In my view, this is exactly the kind of statement one would find in a Form 8–K that would signal that the company is about to file a Chapter 11 petition. Therefore, I do not find the Form 8–K, alone, to be sufficient to rebut the § 547(f) presumption that Debtor was insolvent at the time the Alleged Transfers took place. As such, the Alleged Transfers are avoidable pursuant to § 547(b).

## II. *Res Judicata* as a Bar to the Instant Action

Defendant next argues that the instant action is barred by the doctrine of *res judicata*. (Def.'s Br. (Doc. # 43) at 7–14.) I disagree.

10–Q, here, the *only* evidence provided by Defendant in support of its argument that Debtor was solvent at the time the Alleged Transfers were made is a Form 8–K filed approximately *one month* prior to the date of the first Alleged Transfer. Furthermore, while the issue in *Bros. Gourmet Coffees* was whether the evidence presented by the parties with respect to the debtor's insolvency was sufficient to raise a genuine issue of material fact, the issue here is whether Plaintiff should be forced to proceed with the burden of proving Debtor's insolvency for the purposes of § 547(b) where the *only* evidence submitted by Defendant to rebut the § 547(f) presumption of insolvency is the Form 8–K. I find that he should not.

**20.** Section 101(32) provides in pertinent part:

"insolvent" means—
(A) with reference to an entity other than a partnership, and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation, exclusive of—
(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
(ii) property that may be exempted from property of the estate under section 522 of this title;

■ The doctrine of *res judicata* (or claim preclusion) precludes a party from relitigating claims that were or could have been asserted in a prior action. For the doctrine of *res judicata* to apply, three factors must be present: (1) a final judgment on the merits, rendered by a court of competent jurisdiction, in a prior action involving; (2) the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *E.g., CoreStates Bank, N.A. v. Huls America, Inc.,* 176 F.3d 187, 194 (3d Cir.1999); *In re Mariner Post–Acute Network, Inc.,* 267 B.R. 46, 52 (Bankr.D.Del.2001).

In the context of bankruptcy, most courts find that a confirmation order constitutes a final judgment on the merits with respect to the issues addressed in the plan of reorganization. *See, e.g., Eastern Minerals & Chemicals Co. v. Mahan,* 225 F.3d 330, 336, n. 11 (3d Cir. 2000); *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997); *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enter., Inc.),* 81 F.3d 1310, 1315 (4th Cir.1996); *Heritage Hotel Ltd. P'ship. I v. Valley Bank of Nevada (In re Heritage Hotel P'ship. I),* 160 B.R. 374, 377 (9th Cir. BAP 1993). In addition, "[a] party for the purposes of former adjudication includes one who participates in a Chapter 11 plan confirmation proceeding." *In re Varat Enter.* 81 F.3d at 1316; *see also CoreStates,* 176 F.3d at 195 ("We believe ... that claim preclusion should apply ... between all parties to a bankruptcy case.") With respect to whether a subsequent action is based on a cause of action that was or could have been addressed in a prior proceeding, relevant case law suggests that courts in the Third Circuit consider whether there is an "essential similarity of the underlying events" giving rise to the claims. *Eastern Minerals,* 225 F.3d at 337 (citing *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 984 (3d Cir. 1984)); *CoreStates,* 176 F.3d at 200. However, in *Eastern Minerals,* the Third Circuit recently recognized that "the 'essential similarity' test, when literally construed, is ideally suited for litigation that has been generated by discrete events" and not for litigation arising in the context of bankruptcy. 225 F.3d at 337. In that case, a creditor commenced an alter ego action against a former chapter 11 debtor's sole shareholder in state court seeking to recover a portion of a settled claim that remained unpaid after the debtor's bankruptcy case was closed. *Id.* at 333. In finding that the doctrine of *res judicata* did not bar the creditor's alter ego claim, the Third Circuit stated:

> Claim preclusion doctrine must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case. Difficult as it may be to define the contours of a cause of action in a bankruptcy setting, we conclude that a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

*Id.* at 337–38; *accord In re Mariner,* 267 B.R. at 53–54.

■ In the instant action, I find that the first two factors needed for application of doctrine of *res judicata* are present. The Confirmation Order constitutes a final judgment on the merits with respect to all issues addressed in the Plan. *See, e.g., Donaldson,* 104 F.3d at 554; *In re Varat Enter.,* 81 F.3d at 1315. In addition, both Plaintiff and Defendant and/or their predecessors in interest participated in the Plan confirmation proceeding. *See CoreStates,*

176 F.3d at 195; *In re Varat Enter.*, 81 F.3d at 1316. However, with respect to the third factor, based on the Third Circuit's decision in *Eastern Minerals*, I find that the instant action and the confirmation proceeding do not involve the same cause of action and therefore, the doctrine of *res judicata* does not apply. The factual underpinnings, the theory of this action, and the relief sought herein are not "so close" to the issues actually addressed in the confirmation proceeding that it is unreasonable that this action was not commenced prior thereto or in connection therewith. *See Eastern Minerals*, 225 F.3d at 337–38. Whereas the prior "action" addressed the treatment of Defendant's claims under the terms of the Plan, the instant adversary proceeding seeks avoidance of the Alleged Transfers pursuant to §§ 547 and 550. Although both actions may share some facts in common in that they both arose out of Defendant's pre-petition business relationship with USN, both the "factual underpinnings" and "theory of" an avoidance action are completely different than a determination on the allowability and proper treatment of a creditor's claim under a plan of reorganization. As such, the instant proceeding involves an entirely different cause of action than the claims treatment in the prior confirmation hearing and therefore, *res judicata* does not apply.

Although Defendant does not dispute that the instant action and the prior confirmation proceeding do not constitute the same cause of action, Defendant argues that the third element for application of the doctrine of *res judicata* is satisfied because "Debtors could have brought this preference action before confirmation of the Plan." (Def.'s Br. (Doc. # 43) at 8.) I find this argument to be unpersuasive. First, to the extent Defendant argues that the instant action should have and/or could have been brought at the confirmation proceeding (*id.* at 12–13), I disagree. At least one court has found that a preference action is not one that "could have been brought at the same time as" a prior confirmation hearing for the purposes of *res judicata* because the confirmation process constitutes a contested matter under the Bankruptcy Rules, whereas a preference action must be commenced as an adversary proceeding under Fed.R.Bankr.P. 7001. *See Sunrise Energy Co. v. Maxus Gas Mktg. (In re Sunpacific Energy Mgmt., Inc.)*, 216 B.R. 776, 779 (Bankr. N.D.Tex.1997).

In addition, whether an action "could have been decided in a prior proceeding" is not, in itself, a factor to be examined in determining the applicability of the doctrine of *res judicata*. Rather, it is a conclusion that is determined by application of the three-part test described above, including a determination of whether the subsequent action is based on the same cause of action as a prior proceeding. Defendant's argument that this action is barred by *res judicata* simply because it is one which Defendant believes "could have been brought prior to confirmation of the Plan" is conclusory and completely ignores the test most recently set forth by the Third Circuit in *Eastern Minerals*.[21] Although

---

**21.** In support of its argument, Defendant cites *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 205 (3d Cir.1999), *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir.1997), *In re Am. White Cross, Inc.*, 269 B.R. 555, 559 (D.Del.2001), and *In re Trans World Airlines*, 261 B.R. 103, 119–20 (Bankr.D.Del.2001). However, I find these cases to be inapplica-

ble. Both *CoreStates* and *Donaldson* were decided *prior* to *Eastern Minerals* and therefore, neither applied the test that I rely upon here. In addition, in *Eastern Minerals*, the Third Circuit specifically referred to its decision in *CoreStates* and noted that the holding of *CoreStates* "was largely fact-bound and was the result of 'the coincidence of several un-

Defendant contends that *Eastern Minerals* is inapplicable because the claims at issue in that cases were asserted by a creditor against a non-debtor (Def.'s Br. (Doc. # 43) at 12), I disagree.[22] Nothing in the *Eastern Minerals* decision limits its holding the factual scenario addressed therein and in fact, the rationale of *Eastern Minerals* applies equally to all matters arising in the context of a bankruptcy case, regardless of the parties.

usual circumstances'". *Eastern Minerals*, 225 F.3d at 339. Furthermore, *In re Am. White Cross, Inc.* relies solely upon the *CoreStates* decision and neglects to discuss the impact of *Eastern Minerals* on the test to be applied in determining whether a subsequent action constitutes the "same cause of action" for the purposes of *res judicata*. Finally, I find *In re TWA*, to be inapposite. 261 B.R. at 120 (finding that claim preclusion did not apply because the defendant could not establish that there had been a final judgment on the merits on the claim at issue).

22. In support of its suggestion that the precedent of *Eastern Minerals* is limited to those situations in which a creditor of a debtor sues a non-debtor third party, Defendant cites to a footnote in the *Eastern Minerals* opinion which provides, in part: "Surely it cannot be the case that the corporation's bankruptcy becomes the exclusive forum to address any claims a creditor might have against the non-debtor controlling shareholder based on that shareholder's own conduct." (Def.'s Br. (Doc. # 43) at 12) (citing *Eastern Minerals*, 225 F.3d at 337, n. 13.) Defendant then concludes, without citing any case law in support thereof, that "[t]here is no dispute that the corporation's bankruptcy is the exclusive forum to address claims between the corporate debtor and its creditors." (*Id.*) However, if Defendant's conclusion were true, then § 1123(b)(3)(B), which enables a debtor to preserve certain claims and interests to be pursued post-confirmation, would be rendered meaningless. *See* 11 U.S.C. § 1123(b)(3)(B); *see also* discussion *infra*, Part III. In addition, Defendant's conclusion ignores those cases in which a debtor and/or its successor in interest has sued a creditor post-confirmation with respect to a bankruptcy-related matter. *See, e.g., P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (Matter of*

■ Moreover, even if, as Defendant contends, the third factor for application of the doctrine of *res judicata* was satisfied, most courts hold that where a disclosure statement and/or plan of reorganization expressly reserves an action for later adjudication, *res judicata* does not apply. *See, e.g., D & K Prop. Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257, 259–60 (7th Cir.1997); *Kelley v. South Bay Bank (In re Kelley)*, 199 B.R. 698, 704 (9th

*P.A. Bergner & Co.)*, 140 F.3d 1111 (7th Cir. 1998); *Sunrise Energy Co. v. Maxus Gas Mktg. (In re Sunpacific Energy Mgmt., Inc.)*, 216 B.R. 776 (Bankr.N.D.Tex.1997); *In re Weidel*, 208 B.R. 848 (Bankr.M.D.N.C.1997); *In re Amarex, Inc.*, 74 B.R. 378 (Bankr.W.D.Okla. 1987). It also ignores the portion of the *Eastern Minerals* decision cited above, *see supra*, p. 586, and that portion which provides:

Claim preclusion is complicated in this case *not only* because the instant claim involves a multifaceted factual scenario and extensive course of events, *but also because the prior litigation involved an expansive and complex chapter 11 bankruptcy case.* A bankruptcy case is not a discrete lawsuit. It is commenced by the filing of a petition for relief, which then provides a forum in which any number of adversary proceedings, contested matters, and claims will be litigated. *Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case* over which the court would have had jurisdiction.

225 F.3d at 337. Neither of these cited portions of text limit the Court's discussion of claim preclusion in the context of bankruptcy to the situation in which a creditor sues a nondebtor post-confirmation. Indeed, the fact that this Court recently relied on *Eastern Minerals* in determining the *res judicata* effect of financing orders on a creditor's right to prosecute its claim against chapter 11 debtors indicates that the precedential value of *Eastern Minerals* is not, as Defendant suggests, limited to the specific factual scenario contained therein. *See generally In re Mariner Post–Acute Network, Inc.*, 267 B.R. 46, 52 (Bankr.D.Del.2001); *see also Edwards v. Wyatt*, 266 B.R. 64, 72 (E.D.Pa.2001).

Cir. BAP 1996) ("If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply."); *In re Am. Preferred Prescription, Inc.*, 266 B.R. 273, 277 (E.D.N.Y.2000) ("The case law, however, recognizes an exception to the res judicata bar where the debtor has reserved the right to object to claims in a plan."). In the instant action, as discussed below, both the Disclosure Statement and the Plan expressly reserved the Trustee's right to exercise his avoidance powers subsequent to the Plan's confirmation and to pursue all causes of action and remedies granted pursuant to § 547. (*See* Disclosure Statement at 69; Plan § 12.10.) Therefore, even if the third factor for application of the doctrine of *res judicata* were satisfied, which it is not, the doctrine of *res judicata* would still not apply. *See* discussion *infra*, Part III.

### III. Preservation of the Instant Action in the Disclosure Statement and Plan

■ Defendant does not dispute that where a plan and/or disclosure statement expressly reserves an action for later adjudication, *res judicata* does not apply. (Def.'s Br. (Doc. # 43) at 9.)[23] However, Defendant contends that such a reservation must specifically disclose the proposed subsequent action against the particular defendant. (*Id.* at 9.) Defendant argues

that because here, § 12.8 of the Plan did not disclose any preference or avoidance claims against any of Debtors' creditors, and because § 12.10 of the Plan contained only a general reservation of avoidance powers and causes of action arising under § 547 and did not *specifically* disclose the instant action against Defendant, the instant action was inadequately preserved. (*Id.* at 9–11.) I disagree.[24]

Section 1123 governs the contents of a plan and provides in pertinent part:

(b) Subject to subsection (a) of this section, a plan may—

\* \* \* \* \* \*

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

11 U.S.C. § 1123(b)(3). The courts are divided on how specific the language of retention and enforcement must be under § 1123(b)(3)(B) to adequately reserve a cause of action for adjudication at a later date. *In re Goodman Bros. Steel Drum Co., Inc.*, 247 B.R. 604, 607 (Bankr. E.D.N.Y.2000). Although some courts hold that *res judicata* bars a subsequent

---

**23.** Indeed, in its post-trial brief, Defendant states, "[Trustee] can only pursue this action if he can demonstrate that his preference action against Worldnet was **expressly** reserved for later adjudication." (Def.'s Br. (Doc. # 43) at 9.)

**24.** As a preliminary matter, it is important to recognize that in finding that the doctrine of *res judicata* does not apply, *see* discussion *supra*, Part II, I have already disposed of Defendant's argument that the instant action was not adequately preserved. This is because while some courts consider this argu-

ment in determining whether there was a final judgment on the merits in the prior proceeding, others seem to view it as an exception to the doctrine of *res judicata* that is available to the plaintiff in the event that the doctrine does apply, *see, e.g., D & K Properties*, 112 F.3d at 259–60; *Kelley*, 199 B.R. at 704; *Am. Preferred Prescription*, 266 B.R. at 277. Nevertheless, because Defendant discusses this argument at great length in its post-trial brief ((Doc.# 43) at 9–11), I address the argument separately.

action unless the debtor's disclosure statement and/or plan specifically reserves the right to litigate that specific claim[25], as the court noted in *In re Weidel*, 208 B.R. 848 (Bankr.M.D.N.C.1997), "[s]everal reasons exist for departing from the holding of" those cases. *Id.* at 852.

First, § 1123 distinguishes between what a plan must include and what a plan may include. *See* 11 U.S.C. § 1123. While a plan *may* provide for the retention of certain causes of action by the debtor and/or its representatives, there is no *requirement* that it do so. *See id.* § 1123(b)(3)(B). In addition, even if the language in § 1123(b)(3)(B) could be construed as containing such a requirement, there is nothing in the provision to suggest that the plan must specifically identify each and every claim and/or interest belonging to the debtor that may be subject to retention and enforcement. *See id.; see also In re P.A. Bergner & Co.*, 140 F.3d at 1117 ("While there might be some logic in requiring 'specific and unequivocal' language to preserve claims belonging to the estate that have never been raised, the statute itself contains no such requirement.").

Second, the confirmation process is expedited by allowing debtors to include a general reservation of their right to pursue certain causes of action at a later date. *In re Weidel*, 208 B.R. at 853; *see also Amarex*, 74 B.R. at 380 (addressing issue of whether successor to the reorganized debt-

---

**25.** *See, e.g., D & K Properties*, 112 F.3d at 260, 262 (affirming district court's holding that breach of contract action filed post-confirmation was barred under the doctrine of *res judicata* where confirmed plan included only "a blanket reservation lacking the specificity necessary to reserve a cause of action"); *Kelley*, 199 B.R. at 704 ("Even a blanket reservation by the debtor reserving 'all causes of action which the debtor may choose to institute' has been held insufficient to prevent the application of res judicata to a specific action."); *Am. Preferred Prescription*, 266 B.R. at 279 (finding general reservation in plan to be "insufficient to escape the res judicata bar"); *Matter of Huntsville Small Engines, Inc.*, 228 B.R. 9, 13 (Bankr.N.D.Ala.1998) (finding preference action precluded by plan confirmation under doctrine of *res judicata* where plan and disclosure statement "only contained a general retention clause reserving the debtor's right to pursue post-confirmation all pre-petition causes of action without specifically disclosing the cause of action against [creditor].'"); *Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 103 (S.D.Tex.1993) ("[Debtor] knew about the claim, was mad about it, and hid it within the murky language of the general retention clause."); *Mickey's Enter., Inc. v. Saturday Sales, Inc. (In re Mickey's Enter., Inc.)*, 165 B.R. 188, 193–94 (Bankr.W.D.Tex.1994) (concluding that debtor's disclosure statement, which "contained only a general retention clause which failed to specifically identify any § 547 causes of action" against the defendant, was inadequate). Defendant cites each of these cases, with the exception of *Am. Preferred Prescription*, in support of its argument. (Def.'s Br. (Doc. # 43) at 10–11.) Defendant also cites *Truesdell v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 281 A.D.2d 334, 722 N.Y.S.2d 523, 524 (N.Y.App. Div.2001) (stating, "Nor are such claims saved by claim-reservation provisions of the plan that do not specifically and expressly identify them."), *Harstad v. First Am. Bank*, 39 F.3d 898, 903 (8th Cir.1994), and *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Inv., Inc.)*, 162 B.R. 426 (Bankr.S.D.N.Y. 1993). I note that the *Truesdell* decision does not set forth the language of the insufficient reservation provision referred to therein and that the insufficient reservation in *Harstad* was simply a provision which provided for the bankruptcy court's retention of jurisdiction over "determinations of all causes of actions [sic] between Debtors and any other party, including but not limited to any right of Debtors to recover assets pursuant to the provision of the Bankruptcy Code." Harstad, 39 F.3d at 902. Such a provision is significantly different from the reservation in the instant action which expressly preserves the Trustee's right to exercise "avoidance powers" post-confirmation and pursue "all causes of action and remedies granted pursuant to Section . . . 547." (Plan § 12.10.)

or may maintain complaints to recover preferential transfers under § 547). In my opinion, it is both impractical and unnecessary for a Disclosure Statement and/or Plan to list each and every possible defendant against which a debtor or its representative may bring an avoidance action. As the court stated in *Amarex, Inc.*:

> § 1123(b)(3)(B) serves the useful function of allowing confirmation of a plan before possible claims against others have been fully investigated and pursued. To say confirmation must await a final decision of all possible preference complaints would either inordinately delay confirmation, with all the attendant expense, or result in a windfall in favor of those who received preferential transfers.

74 B.R. at 380 (referring to Judge Bare's decision in *DuVoisin v. E. Tennessee Equity, Ltd. (In re S. Indus. Banking Corp.),* 59 B.R. 638 (Bankr.E.D.Tenn.1986)). Indeed, in large chapter 11 cases, the investigation and litigation of all possible avoidance actions to final judgment can take years. To force the debtor to remain in bankruptcy until a final determination is made as to what transfers represent viable preference actions would act as a detriment to both the debtor and its creditors by slowing down the reorganization process. In many of the large chapter 11 cases in this Court, the plan of reorganization and/or liquidation is often confirmed before the debtor and/or a trustee has undertaken a detailed investigation of the potential preference actions. In large Chapter 11 cases there may be hundreds or even thousands of transaction within the 90–day period and considerable time and effort is needed to examine those transactions in light of the numerous defenses provided for in § 547(c). Quite often, it is appropriate to delay that undertaking until after plan confirmation. For example, in *In re Ameriserve Food Distribution, Inc., et al,* (Case No. 00–358(PJW)), confirmed on November 28, 2000, 874 preference actions were filed. Each of these actions was filed on or subsequent to March 13, 2001. Similarly, in *In re APL, Co.* (Case No. 98–01596(PJW)), confirmed on May 27, 1999, a total of 86 preference actions were filed, each subsequent to the confirmation date. Likewise, in *In re APS Holding Corp.* (Case No. 98–00197(PJW)), confirmed on October 19, 1999, a total of 95 preference actions were filed, all subsequent to the confirmation date. In each of these case, both the plan and disclosure statement contained general reservations similar to those at issue here. They did not specify each and every potential creditor against whom an avoidance action might conceivably be filed. Rather, they preserved the applicable party's general right to pursue "avoidance actions" or "preference actions" post-confirmation, and specified only those particular potential defendants of which the plan proponents were focused on at the time.[26] Simi-

---

26. Defendant argues that Debtor could have easily identified the potential preference actions with specificity in the Disclosure Statement because it had sufficient information to do so prior thereto. (Def.'s Br. (Doc. # 43) at 7.) In support of this argument, Defendant refers to Debtor's Statement of Financial Affairs which provided notice of the fact that three transfers totaling $75,000 were made from Debtor to Defendant within the ninety days preceding bankruptcy. (*Id.*) However, this fact, standing alone, is insufficient to support the conclusion that the Plan proponents should have specifically identified the instant action against the Defendant in the Disclosure Statement and/or Plan. As discussed above, in many cases, hundreds, if not thousands, of transfers are made within the preference period and it takes time for the debtor and/or trustee to investigate which transfers will support a viable cause of action for turnover and which will not. Furthermore, it is not uncommon for the professionals employed by a creditors' committee to undertake their own

larly, in the instant action, both the Plan and Disclosure Statement expressly provided that "the Liquidating Trust will have the exclusive right to enforce any and all causes of action against any Person and rights of the Debtors that arose before or after the Petition Date ... including but not limited to all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code." (Plan § 12.10; Disclosure Statement at 69.) This statement clearly evinces the Plan proponents' intent to preserve the right to pursue and enforce preference actions for the Trustee and as such, satisfies the statutory requirements of §§ 1123(b)(3). Having received this information, and knowing that it received a payment from Debtors within the ninety day preference period, Defendant was on notice that an avoidance action might subsequently be filed against it.

Third, a confirmed plan acts as a binding contract on all the parties thereto. *See* 11 U.S.C. § 1141(a)[27]; *see also In re Varat Enter.*, 81 F.3d at 1315; *In re Sug-*

arhouse Realty, Inc., 192 B.R. 355, 362 (E.D.Pa.1996). Prior to a plan's confirmation, creditors have the opportunity to examine the terms of the proposed plan and respond accordingly. In the instant action, Defendant received notice of and had the opportunity to object to the both the Plan and Disclosure Statement. In particular, Defendant could have objected to the Plan's reservation of the Trustee's right to exercise his avoidance powers post-confirmation. However, Defendant did not do so.[28] Accordingly, pursuant to § 1141(a), Defendant is now bound by the terms of the Plan, and as such, is precluded from objecting to those provisions reserving the Trustee's right to exercise his avoidance powers post-confirmation and pursue those causes of action arising under § 547. *See Weidel*, 208 B.R. at 852–53.

To the extent Defendant may argue that it failed to object to the Plan because the information provided with respect to the instant action in the Disclosure Statement was inadequate (Def.'s Br. (Doc. # 43) at 13), I find this argument to be unpersuasive.[29] First, the Court has

---

examination of the 90–day transfers to come up with their own list of viable preference actions. In this regard, the creditors' committee cannot be bound by what the debtor at the commencement of a case believes to be relevant information. Thus, the fact that a debtor has provided notice of such a transfer in its Statement of Financial Affairs, typically filed at the beginning of a chapter 11 case, is irrelevant as to whether or not a particular transfer should be identified in a disclosure statement and/or plan as supporting an action for turnover.

**27.** Section 1141(a) provides:
Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity

security holder, or general partner is impaired under the plan and *whether or not such creditor, equity security holder, or general partner has accepted the plan* (emphasis added).

**28.** Nor did Defendant vote on the Plan. (Pre–Trial Order ¶ 8.)

**29.** It is difficult to see how Defendant could make such an argument given that at the trial on this matter, Mr. McBride testified that although he received copies of both the Disclosure Statement and Plan, he did "not really" read them due to "a sense of resignation that [he] would never get [his] money." (Trans. at 50–51.) Although Mr. McBride also attempted to testify that would have approached the Plan and Disclosure Statement differently had he not believed that the firm Foley and Lardner ("Counsel") was representing Worldnet's interests in the bankruptcy

already entered an Order (Doc. # 576, Case No. 99–383) approving the Disclosure Statement as containing adequate information in accordance with § 1125 [30]. Second, while it is true that some courts view § 1123(b)(3) as, at least in part, a notice provision, *see Harstad,* 39 F.3d at 903, the Bankruptcy Code contemplates that debtors may seek confirmation of their plans prior to litigating all avoidance actions. *Sunrise Energy Co.,* 216 B.R. at 779. Therefore, in my opinion, a reservation in a plan of reorganization indicating the *type* or category of claims to be preserved is sufficiently informative to provide creditors with notice that their claims may be challenged post-confirmation. *See, e.g., P.A. Bergner & Co.,* 140 F.3d at 1117 ("The courts that have spoken of the need for 'specific' and 'unequivocal' language have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individual claims must be listed specifically.") (citing

*Harstad,* 155 B.R. 500, 510 (Bankr.D.Minn. 1993) and *In re Mako,* 120 B.R. 203, 209 (Bankr.E.D.Okla.1990)); *Goodman Bros.,* 247 B.R. at 609 ("The court's examination of the text of § 1123(b)(3) lead [sic] it to the conclusion that the statute does not contain a requirement that the language of a plan be 'specific and unequivocal.' "). Furthermore, with respect to those creditors who are the potential targets of a preference action, such creditors know, or should know, whether they received a payment from the debtor within the ninety days preceding the petition date. As such, when a plan or disclosure statement contains a reservation of a trustee's right to exercise his "avoidance powers" post-confirmation and pursue "causes of action and remedies granted pursuant to . . . § 547", those creditors also know that there is a possibility that they may be the target of one of those actions. Such is the case here. Defendant knew or should have

---

case, upon hearing such testimony, the Court concluded that the witness had been coached. Mr. McBride's alleged "belief" that Counsel was representing Worldnet's interest during the bankruptcy case is based on a letter from Counsel dated February 7, 2000 which provides, in pertinent part:

> *The Official Committee of Unsecured Creditors recommends that you vote in favor of the Plan.* The Plan offers the greatest likelihood for maximizing recovery on allowed claims. The Committee has reserved its right to file a protective objection to provisions of the Plan that establish releases in favor of certain third parties. The Committee is presently conducting an investigation related to possible causes of action that would be released under the Plan.

(Letter, App. to Def.'s Br. (Doc. # 44) Ex. E at 1.) The letter is signed "Foley & Lardner By: [signature] *Counsel to the Official Committee of Unsecured Creditors* ". (*Id.*) No where does this letter suggest that Counsel was representing Defendant's interests. In addition, the letter expressly refers to the fact that the Committee was, at that time, "conducting an investigation related to possible causes of ac-

tion that would be released under the Plan" (*id.*), and at trial, Mr. McBride testified that he had no personal knowledge as to what causes of action Counsel was referring to (Trans. at 53).

**30.** Section 1125 governs the contents of a disclosure statement and provides that acceptance or rejection of a plan may not be solicited until each holder of a claim or interest receives the plan or a summary thereof, "and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). "Adequate information" is defined in § 1125(a)(1) as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan. . .

known that it received a payment from Debtor within the preference period. Both the Disclosure Statement and Plan contain a clear statement of the Trust's retention of the right to exercise its avoidance powers post-confirmation and pursue "all causes of action and remedies granted pursuant to . . . § 547". (Disclosure Statement at 69; Plan § 12.10.) Therefore, Defendant knew or should have known that the Trustee could have commenced the instant action post-confirmation and as such, Defendant cannot now claim that such action is barred.

For the reasons discussed above, I reject the rationale of those cases which hold that *res judicata* bars a subsequent action unless the debtor's disclosure statement and/or plan specifically reserves the right to litigate that specific claim, and choose to follow those courts which hold that a subsequent action is *not* barred by a prior confirmation hearing under the doctrine of *res judicata* where the disclosure statement and plan contain a *general* reservation of the right to pursue preference actions post-confirmation. *See Weidel*, 208 B.R. at 853–54 (holding that res judicata did not bar debtors' objection to creditor's proof of claim where the plan expressly reserved the general right to assert post-confirmation objections to claims); *see also Envirodyne Indus., Inc. v. Conn. Mutual*

*Life Co. (In re Envirodyne Indus., Inc.)*, 174 B.R. 986, 991 (Bankr.N.D.Ill.1994) (finding that debtor was not barred from bringing proceedings against petitioning bondholders under the doctrine of *res judicata* based on debtor's failure to explicitly reveal its potential claims against such bondholders in its disclosure statement); *In re Outdoor Sports Headquarters, Inc.*, 168 B.R. 177, 183 (Bankr.S.D.Ohio 1994) (finding that *res judicata* did not bar unsecured creditor's objection to larger creditor's claim where neither the debtor's disclosure statement or plan contained any provision pertaining to the allowance or disallowance or suggesting or requiring that the action of any creditor be brought against any other, including defendant).[31]

## IV. The Modifications Made to § 12.8 of the Plan

■ Defendant next argues that the post-acceptance/pre-confirmation modification ("Modification") made to § 12.8 of the Plan in the Confirmation Order constitutes an admission that the Plan, as presented for solicitation of ballots, failed to reserve any post-confirmation preference claims, and that such modification is void for lack of notice and failure to comply with federal bankruptcy law and the requirements of

---

31. Although the Disclosure Statement and Plan in this case contains language sufficient to find that there was an express reservation of rights to pursue avoidance actions, I note that in some large Chapter 11 cases, that reservation of rights includes an express negation of the doctrine of *res judicata*. For example, in the plan of *Ameriserve Food Distribution, Inc., et al.* (Doc. # 2599, Case Nos. 00–358, 00–373 through 00–385), the reservation of rights language reads, in part, as follows:

Unless Bankruptcy Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or any Final

Order, the Debtors expressly reserve all Bankruptcy Causes of Action and Unknown Causes of Action, including the Bankruptcy Causes of Action described herein, as well as any other Bankruptcy Causes of Action or Unknown Causes of Action, for later adjudication *and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Bankruptcy Causes of Action upon or after the confirmation or consummation of the Plan.*
(*Id.* at 34) (emphasis added).

constitutional due process. (Def.'s Br. (Doc. # 43) at 14–16.)[32] I disagree.

As discussed above in Part III of this opinion, the Plan and Disclosure Statement, as submitted for solicitation, contained a clear and unambiguous statement of the Plan proponents' intent to preserve for the Trustee "all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 510, 541, 544, 545, 547 through 551 and 553 of the Bankruptcy Code." (Plan § 12.10; Disclosure Statement at 69.) This language was contained within a section of the Plan clearly entitled "**Retention and Enforcement of Claims and Equity Interests**" which was itself located in Article XII of the Plan, entitled "**EFFECTS OF CONFIRMATION**". (Plan at 47–51) (emphasis in original). Section 12.8, located on the page of the Plan immediately preceding § 12.10, and entitled "**Preservation of _Certain_ Claims**" (underlined emphasis added) provides that "[n]othing in this Article 12 of the Plan shall discharge, release, limit or impair the rights of" _certain_ parties to pursue _certain_ claims post-confirmation. (Plan § 12.8.) As modified by the Confirmation Order, § 12.8 now provides that among the claims not released by Article 12 are "any Avoidance Claim[s] against any Person, other than a Retained Professional." (Confirmation Order (Doc. # 624) at 16.) Contrary to Defendant's contention, this Modification does not "rewr[i]te the reservation of claims provision of the Plan to insert a

general reservation clause" (Def.'s Br. (Doc. # 43) at 15), or constitute a material modification of the treatment of creditors under the Plan such that a "resolicitation" of ballots is required pursuant to § 1127 and Federal Rule of Bankruptcy Procedure 3019 ("Rule 3019").

First, the general reservation of claims provision contained in the Plan, clearly entitled "**Retention and Enforcement of Claims and Equity Interests**", is § 12.10, not § 12.8. The language contained in § 12.10 preserving the Trustee's right to pursue causes of action arising under § 547 remained the same both prior to and post-confirmation. As such, it is clear that the Modification of § 12.8 does not "rewr[i]te" § 12.10 "to insert a general reservation clause". Rather the Modification merely clarifies that nothing in Article 12 of the Plan should be construed as a release of certain claims. Obviously, any claims "reserved" in § 12.10 could not have been released under Article 12. This is true whether § 12.8 specifically says so or not.

In addition, the Confirmation Order clearly provides that the Modification was made pursuant to § 1127(a). (Confirmation Order (Doc. # 624) at 15, ¶ 4.) Section 1127(a) provides:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent

---

**32.** Toward the end of its argument, Defendant also asserts for the first time, without presenting _any_ legal authority or factual basis in support thereof, that "[t]he improper conduct of the Debtors and others at the confirmation hearing and this void modification to the Plan serves as a sound basis for this Court to enter an order dismissing this preference action for a lack of standing and failure to state a claim upon which relief can be granted." (Def.'s

Br. (Doc. # 43) at 16.) I find this argument to be without merit. First, there is nothing on the record to support the contention that "Debtors and others" engaged in improper conduct at the confirmation hearing. In addition, as discussed above, the modification is not void. _See_ discussion _infra,_ Part IV. Furthermore, Plaintiff _clearly_ has standing to pursue the instant action as Trustee of the Trust pursuant to § 12.10 of the Plan.

of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a). Section 1127(a) does not speak to the issues of resolicitation or materiality of a modification. It simply provides that a plan proponent may modify the plan at any time prior to confirmation. The only conditions placed on such a modification is that is must meet the requirements of §§ 1122 and 1123. Defendant does not contend that the Plan, as modified, fails to comply with those sections of the Code (Def.'s Br. (Doc. # 43) at 14–16), and in fact, it does not.[33]

Furthermore, Fed.R.Bankr.P. 3019 provides in pertinent part:

> "In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. *If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court* that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan."

Fed.R.Bankr.P. 3019 (emphasis added). Defendant does not, and cannot, argue that it is a "trustee," "committee appointed under the Code," or an "entity designated by the court" to receive notice of a proposed post-acceptance/pre-confirmation modification to the Plan. As such, nothing Rule 3019 required the Plan proponents to send Defendant prior notice of the proposed modification to § 12.8. Rather, Rule

3019 places the burden on the Court, after hearing on notice to such parties, to insure that the proposed modification "does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification". *Id.* Once the Court makes such a determination, Rule 3019 expressly provides that the proposed modification "shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan." *Id.* In this case, the Court found that the modification to § 12.8 submitted in the proposed Confirmation Order did not "materially or adversely affect or change the treatment of any Claim against or Equity Interest in any Debtor." (Confirmation Order (Doc. # 624) at 12, ¶ MM.) As such, the Modification was deemed accepted by all creditors and equity security holders who previously accepted the Plan.

## V. Worldnet's Payments to the Consultants as Subsequent New Value

Defendant next argues that even if the Alleged Transfers are avoidable pursuant to § 547(b), such transfers are not recoverable by Plaintiff because Defendant provided Debtor with subsequent new value ("Subsequent New Value") in accordance with § 547(c)(4). (Def.'s Br. (Doc. # 43) at 16–20.) Defendant contends that such Subsequent New Value consists of payments ("Payments") made by Worldnet to the Consultants for services previously performed for USN. (Id.) Although it acknowledges that such Payments discharged its own liability for the Consultants' fees, Defendant argues that the Payments also constitute Subsequent New Value because if Defendant had not made such Payments, the Consultants would

---

**33.** Indeed, in paragraph U of the Confirmation Order, this Court found that the Plan, as modified, complies with §§ 1122 and 1123.

have been able to collect an amount equal to such Payments from Debtor under both federal and Illinois law as a "joint employer". (*Id.*) In support of its argument, Defendant contends that the question of whether a "joint employer" relationship exists under both federal and Illinois law is primarily a question of who controls the employee. (*Id.* at 18.) Defendant argues that based on the facts that: (1) the Consultants provided services to Debtor at its place of business and under its own Project Leader's supervision; (2) Debtor had the right to terminate the Consultants' services at any time; and (3) USN's Project Leader signed an approval of the daily hours worked by the Consultants and approved the Consultants' timesheets twice per month before the Consultants would be entitled to be paid, it is clear that Debtor controlled the Consultants and therefore, could be determined to be a "joint employer" of the Consultants under both federal and Illinois law. (*Id.* at 17, 19–20.) I find this argument to be unpersuasive.

In support of its argument that Debtor could be characterized as a "joint employer," and is therefore jointly and severally liable for the Consultants' fees under federal and Illinois law, Defendant cites to the definition provision of the Illinois Wage Payment and Collection Act, 820 ILL.COMP.STAT.ANN. 115/1 et seq. (2002) ("IWPCA")[34] and *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207 (7th Cir.1986), a case addressing the definition of a joint employer for the purposes of the Fair Labor Standards Act ("FLSA")[35].

**34.** Specifically, Defendant cites to the following::

> As used in this Act, the term "employer" shall include any individual, partnership, association, corporation, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed.
> As used in this Act, the term "employee" shall include any individual permitted to work by an employer in an occupation, but shall not include any individual:
> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and
> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and

> (3) who is in an independently established trade, occupation, profession or business.
> 820 ILL.COMP.STAT.ANN. 115/2 (2002).

**35.** Defendant cites to that portion of the *Karr* decision which provides:

> Two or more employers may jointly employ someone for the purpose of the FLSA. *Falk v. Brennan*, 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973). **All joint employers are individually responsible for compliance with the FLSA.** 29 C.F.R. § 791.2(a) (1984). [footnote omitted] Regulations issued by the Wage and Hour Administrator indicate that a joint employment relationship will be considered to exist in the following circumstances:
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by,

(Def.'s Br. (Doc. # 43) at 19–20.)[36] However, neither the IWPCA, nor the FLSA is relevant to the instant dispute. The matter before me does not involve an action commenced under the FLSA or the IWPCA. In addition, the policies behind the FLSA and the IWPCA are completely different from those underlying the Bankruptcy Code. While the FLSA and IWPCA were enacted to establish a minimum standard of living necessary for the health, efficiency, and general well-being of workers, and to protect workers from the superior bargaining power of their employers, *see* 29 U.S.C.A. § 202 (2002); *Miller v. Kiefer Specialty Flooring, Inc.*, 317 Ill. App.3d 370, 251 Ill.Dec. 49, 739 N.E.2d 982, 986 (2000) ("The purpose of the [IWPCA] is to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation without retaliation from employers; *this cause of action arises out of the employment contract.*") (emphasis added), the Bankruptcy Code was enacted to provide a forum to facilitate the rehabilitation of financially distressed businesses and individuals, and to insure equality of distribution to creditors. As such, whether Debtor "could be" characterized as a joint employer for the purposes of the FLSA or the IWPCA is irrelevant for the purposes of the instant preference action. Indeed, Defendant fails to cite any authority to support the proposition that the definition of "joint employer" under the FLSA and/or IWPCA has any bearing on the instant dispute.

Furthermore, even if the definition of "joint employer" under the FLSA or IWPCA were relevant to the instant dispute, which it is not, Defendant fails to cite any specific provision of either the FLSA or the IWPCA pursuant to which the Consultants could assert a claim against Debtor for fees which Defendant failed to pay them. Indeed, Defendant cites no authority to support the proposition that, pursuant to the FLSA, the IWPCA, or any other legal or equitable theory[37], the Consultants could successfully pursue a claim against Debtor for fees for which Defendant is contractually obligated to pay. Accordingly, I am not persuaded by Defendant's argument that certain of its prepetition Payments to the Consultants constitute Subsequent New Value pursuant to § 547(c)(4), and I therefore find that such Payments are both avoidable and recoverable pursuant to §§ 547 and 550.

or is under common control with the other employer.

787 F.2d at 1207, *cited in* Def.'s Br. (Doc. # 43) at 19 (emphasis added by Defendant).

**36.** In addition, Defendant also cites *Mosley v. Northwestern Steel & Wire Co.*, 76 Ill.App.3d 710, 31 Ill.Dec. 853, 394 N.E.2d 1230, 1236–37 (1979). (Def.'s Br. (Doc. # 43) at 18.) However, I find *Mosley* to be inapposite. The primary issue facing the court in that case was whether a "loaned employee" relationship existed between a contractor and a crane operator for the purposes of determining the contractor's liability, vis-a-vis a subcontractor, for certain acts of the crane operator which violated the Occupational Safety and Health Act and ultimately caused the death of a co-worker. The loaned employee doctrine is used to determine liability for an employee's wrongful acts in the context of a possible multiple employer situation, and has no bearing on whether, as Defendant contends, Debtor could be found jointly and severally liable for the Consultants' fees.

**37.** Defendant has also argued that Debtor "could be" liable to the Consultants for their fees under principles of agency and common law *quantum meruit*. (Motion (Doc. # 23) at 9; Def.'s Br. (Doc. # 43) at 19.) In light of the fact that Defendant has failed to cite any authority in support of these arguments, and the fact that *quantum meruit* applies in situations where there is no actual contract between the parties, I find this argument to be unpersuasive.

## VI. Plaintiff's Alleged Breach of His Fiduciary Duty to the Trust

Defendant next argues that Plaintiff breached his fiduciary duties to the Trust, and to Defendant as a beneficiary of thereof, by failing to exercise care, diligence and skill in deciding which claims to prosecute and how far to go before abandoning such claims. (Def.'s Br. (Doc. # 43) at 20–25.) I disagree.[38]

Defendant cites no legal authority in support of its argument that Plaintiff's alleged breach of fiduciary duty to the Trust constitutes a viable defense to the instant preference action.[39] Nevertheless, assuming that a breach of Plaintiff's fiduciary duty to the Trust could constitute a viable defense to this action, I find that, based on the facts and circumstances of this case, such a "defense" must fail.

■ In support of its argument that Plaintiff has breached his fiduciary duty to the Trust and/or engaged in bad faith in conducting this lawsuit, Defendant first asserts:

> The same lawyers who were co-counsel representing the Creditors' Committee in the bankruptcy proceeding, i.e., the same lawyers who unsophisticated creditors could reasonably expect were watching out for their interests, have filed voluminous adversary complaints against their prior "clients" prosecuting claims that arose in the prior bankruptcy proceeding and were never disclosed to the creditors. These same lawyers are paid without accounting to creditors or court approval under the terms of the liquidation plan. Indeed, these are the lawyers who sent a letter dated February 7, 2000 to unsecured creditors recommending as counsel for the Creditors [sic] Committee that the creditors vote for the Plan because "[t]he Plan offers the greatest likelihood for maximizing recovery on allowed claims." (citation omitted) Nowhere did these lawyers disclose their potential conflict of interests or personal interests in representing the liquidating trustee against the same creditors to whom it was recommending a favorable vote for the Plan.

(Id. at 21–22.) However, these facts do not support a conclusion that Plaintiff and/or Counsel have conducted themselves in bad faith. First, the fact that Defendant refers to Debtors' creditors as Counsel's "prior 'clients'" is both misleading and absurd. As discussed above in footnote 29, nothing in the February 7, 2000 letter ("Letter") sent by Counsel to Debtors' unsecured creditors indicates or implies that Counsel represented any party in the bankruptcy other than the Official Committee of Unsecured Creditors ("Committee"). (See Letter, App. to Def.'s Br. (Doc. # 44) Ex. E at 1.) In addition, there is nothing on the record to indicate that

---

**38.** As a preliminary matter, I note that Defendant first raised this argument in the Pre-Trial Order filed by the parties on March 7, 2002, thereby seeking to amend its Answer (Doc. # 7) to include this argument as an affirmative defense pursuant to Local Rule 7016–2(d). (Def.'s Br. (Doc. # 43) at 21.) This argument raises two issues: (1) whether Defendant should be permitted to amend its Answer to include this argument as an additional affirmative defense; and (2) whether this argument constitutes a viable defense. However, because I find that this argument does not constitute a viable defense, see discussion infra, Part VI, there is no need to determine whether Defendant should be permitted to amend its Answer.

**39.** The only cases relied upon by Defendant are cited in support of Defendant's argument that Plaintiff owes a fiduciary duty to all creditors not to incur attorneys' fees and expenses in excess of the probable recovery. See In re Taxman Clothing, 49 F.3d 310 (7th Cir.1995); In re Smith Tech. Corp., 1999 WL 1427681 (D.Del.1999).

Counsel ever represented to Worldnet that Counsel would represent Worldnet's interests in the bankruptcy or that Mr. McBride's belief that Counsel would do so was reasonable. Therefore, even if Defendant believed that Counsel was representing its interests in the bankruptcy, such a belief was certainly not the result of bad faith on the part of Counsel.

In addition, the facts that Counsel represented the Committee in the bankruptcy case and now represent Plaintiff, and that Counsel did not disclose this alleged "potential conflict of interest" to the unsecured creditors upon recommending that they vote for the Plan, does not support a finding of bad faith. In chapter 11 cases in which the plan contemplates the formation of a liquidating trust, it is not at all unusual for the attorneys who represented the unsecured creditors' committee during the bankruptcy case to represent the liquidating trustee post-confirmation. Over the course of the bankruptcy, these attorneys acquire both knowledge and an understanding of the debtor's affairs and therefore, by engaging the services of these attorneys post-confirmation, it becomes easier and cheaper for the liquidating trustee to pursue the claims assigned to him by the debtor pursuant to the terms of the plan.

 Furthermore, the manner in which Counsel is paid under the terms of the Plan is irrelevant for the purposes of this dispute. As discussed above in Part III of this opinion, a confirmed plan acts as a binding contract on all the parties thereto. *See* 11 U.S.C. § 1141(a); *see also In re Varat Enter.*, 81 F.3d at 1315; *In re Sugarhouse Realty*, 192 B.R. at 362. Defendant received notice of and had the opportunity to object to the manner in which the Trust's administrative expenses would be handled under the Plan. However, Defendant did not do so. As such, Defendant cannot now contend that Counsel, in receiving payment in accordance with the terms of the confirmed Plan, is engaging in bad faith.

 Defendant next argues that Plaintiff has breached his fiduciary duty to creditors by expending more than warranted for the probable recovery of this case by engaging in the following conduct: (a) attempting to default Defendant after settlement discussions failed and then flying an attorney from Chicago to Delaware to argue a motion for default; (b) agreeing to appear for a deposition and then lying about the agreement and refusing to appear and forcing Defendant to file a motion to compel his appearance for a deposition for which he still did not appear, and then seeking this Court's protection from appearing for his deposition; (c) failing to comply with discovery disclosures required by Fed.R.Civ.P. 26; (d) negotiating settlement terms directly with Mr. McBride and then sending Defendant's counsel draft settlement agreements imposing numerous conditions and terms never negotiated to and then refusing to honor settlement terms negotiated by Mr. McBride with Plaintiff personally; (e) filing and compelling Defendant to brief a response to a misleading Rule 37 motion for trial that had no basis in law or fact and then informing Defendant that Plaintiff was not going to proceed with said motion minutes before trial; (f) engaging in improper and obstructionist coaching of Plaintiff's sole witness at his deposition, including repeated and persistent "objections" to coach answers and discussing the deponent's testimony with him during a bathroom break; and (g) identifying, only 28 days before the close of discovery in this case, Plaintiff's sole witness for trial who is an employee of the same company that employs Plaintiff, and who was never disclosed as a witness with discoverable information pursuant to

Rule 26(a) and (e), and then, because of the witness' unavailability, not producing him for deposition until two days prior to the close of discovery, approximately three weeks prior to the trial.[40] (Def.'s Br. (Doc. # 43) at 22–23.) In addition, Defendant also asserts that Plaintiff has done "everything he could to keep [Defendant] from finding out" that Plaintiff has failed to keep accounting of how much his preference cases are costing creditors. (*Id.* at 23–24.). However, there is absolutely nothing on the record to support the veracity of any of these allegations. Indeed, Defendant makes most of these allegations, for the first time, in its post-trial brief. The Court need not consider whether, if true, such allegations would constitute a breach of Plaintiff's duty to the Trust.

Similarly, there is also no support for Defendant's contention that, "more probably than not," Plaintiff has spent more in prosecuting this action than he expects to recover (*id.* at 25).[41] Indeed, in its post-trial brief, Defendant acknowledges that "it is impossible . . . to say how much was spent on the instant case." (*Id.* at 25.) Although Defendant also contends that "it is easy for a Court to merely look at the docket and issues and to see that more probably than not, [Plaintiff] has spent

more than $53,726.00 pursuing Worldnet" (*id.*), "it is easy" for Defendant to make such a statement without providing any evidence in support thereof.

Due to the absence of any factual support for Defendant's argument, I find that Plaintiff has neither failed to exercise care, diligence and skill in prosecuting this action, nor breached any fiduciary duty to the Trust and/or to Defendant as a beneficiary thereof. As a result, Defendant's fiduciary duty defense, along with all of its other defenses, must fail.

## VII. Plaintiff's Entitlement to Interest

Plaintiff argues that he is entitled to recover prejudgment interest on the Alleged Transfers from October 2, 2000, the date on which Plaintiff first demanded return of the Alleged Transfers from Defendant. (Pl.'s Br. (Doc. # 41) at 35–37.) In addition, Plaintiff also seeks to recover post-judgment interest on the Alleged Transfers until the judgment is satisfied pursuant to 28 U.S.C. § 1961(a). (*Id.* at 37–38.) Although I agree that Plaintiff is entitled to recover both pre– and post-judgment interest, I find that the prejudgment interest should be calculated from December 15, 2000, the date on which the instant action was commenced.

---

40. Defendant also asserts that more examples of Plaintiff's bad faith are set forth in Defendant's Response (Doc. # 31) to one of Plaintiff's prior motions.

41. Defendant attempts to support this allegation with testimony from the trial given by Mitchell Hirsch, Plaintiff's accountant and financial advisor in connection with USN's bankruptcy. (Def.'s Br. (Doc. # 43) at 24–25.) However, Mr. Hirsch's testimony simply reveals that: (1) the rates which Counsel charge to work on the preferences actions arising out of USN's bankruptcy vary by attorney (Trans. at 72); (2) Frank DiCastri, one of Plaintiff's attorneys, charges approximately $275 per hour (*id.*); (3) Mr. Hirsch has not analyzed the amount of fees incurred by

Counsel in providing services to Plaintiff in connection with the USN preference actions on a case-by-case basis (*id.* at 69–70); and (4) Mr. Hirsch does not know how much Counsel has charged in rendering services to Plaintiff with respect to the instant action (*id.* at 70). In addition, Mr. Hirsch testified that it was fair to say that he has been in charge of supervising all of the preference actions filed in connection with the USN bankruptcy, and that he has 3–4 staff members working underneath him full-time. (*Id.* at 66.) Despite Defendant's contention to the contrary, Mr. Hirsch has provided no testimony as to the amount of time his staff has spent on matters pertaining to the USN preference actions.

**602**

## A. Post-judgment Interest

Plaintiff's entitlement to post-judgment interest is governed by 28 U.S.C. § 1961(a) which provides, in pertinent part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court ... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

28 U.S.C. § 1961(a) (2001) (emphasis added). The use of the word "shall" indicates the mandatory nature of such interest "on any money judgment in a civil case". *See id.; see also In re Connaught Properties, Inc.*, 176 B.R. 678, 684 (Bankr.D.Conn. 1995) (" 'The allowance of post-judgment interest under 28 U.S.C. § 1961 is mandatory for any money judgment.' ") (quoting *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 58 (2d Cir.1984)). Therefore, I find that Plaintiff is entitled to recover post-judgment interest on the award until the judgment is satisfied.

## B. Prejudgment Interest

In contrast to the mandatory nature of an award for post-judgment interest, the award of prejudgment interest in a preference action is within the discretion of the bankruptcy court. *See, e.g., Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir.1997); *Sigmon v. Royal Cake Co., Inc. (In re Cybermech, Inc.)*, 13 F.3d 818, 822 (4th Cir. 1994); *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1281 (8th Cir.1988); *In re R.M.L., Inc.*, 195 B.R. 602, 623 (Bankr.M.D.Pa.1996); *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 342 (E.D.Pa.1988). Nevertheless, most courts find that awarding prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds. *See, e.g., Milwaukee Cheese*, 112 F.3d at 849; *Matter of Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1339–40 (5th Cir.1995); *Sigmon*, 13 F.3d at 822–23 ("The award of prejudgment interest therefore serves to 'compensate the debtor's estate for appellant's use of those funds that were wrongfully withheld from the debtor's estate during the pendency of the current suit.' ") (citing *In re Investment Bankers, Inc.* 4 F.3d 1556, 1566 (10th Cir.1993)); *Sacred Heart Hosp. of Norristown v. E.B. O'Reilly Serv'g Corp. (In re Sacred Heart Hosp. of Norristown)*, 200 B.R. 114, 119 (Bankr.E.D.Pa.1996) ("[P]ast decisions of this court have established that the Debtor is generally entitled to pre-judgment interest from at least the date of the filing of a proceeding challenging preferential payments ..."); *see also P.A. Bergner & Co.*, 140 F.3d at 1123. As the Seventh Circuit stated in *Milwaukee Cheese*, the discretion to award prejudgment interest is not "authorization to decide who deserves the money more." 112 F.3d at 849. "Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so." *Id.; accord P.A. Bergner & Co.*, 140 F.3d at 1123.

In the instant action, I find no "sound reason" not to award Plaintiff prejudgment interest on his recovery. Although Defendant argues that the Court should not award Plaintiff prejudgment interest because this case constitutes a windfall to Plaintiff and his attorneys (Def.'s Br. (Doc. # 43) at 25), I find this argument to be unpersuasive. Defendant has presented no valid defense to the underlying

preference action, *see* discussion *supra*, Parts I–VI, and Plaintiff's request for pre-judgment interest is timely. *See, e.g., In re Armstrong*, 260 B.R. 454, 460 (E.D.Ark. 2001) (affirming bankruptcy court's denial of pre-judgment interest where defendant was not "wholly lacking in a worthy or credible defense"); *Sacred Heart Hosp.*, 200 B.R. at 119 (finding that debtor was not entitled to prejudgment interest where "defendant had an admittedly valid § 547(c)(4) defense to more than half of the amount originally claimed and a respectable § 547(c)(2) defense as to the balance"); *see also In re Roco Corp.*, 37 B.R. 770, 774 (Bankr.D.R.I.1984) (denying award of prejudgment interest where trustee sought to amend order entered by the court more than two years before to include prejudgment interest). In addition, there is no evidence that Plaintiff has gratuitously delayed commencement of this action in order to increase the amount of the recovery. *See Milwaukee Cheese*, 112 F.3d at 849 "Gratuitous delay by the party seeking the award—delay that injures the other side by forcing it to act as an uncompensated trustee or investment manager—might be a reason to limit an award of interest." (citing *Milwaukee v. Cement Div. of Nat'l Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995)). As such, I find that Plaintiff is entitled to recover prejudgment interest on the amount of the Alleged Transfers recoverable pursuant § 550. *See, e.g., Milwaukee Cheese*, 112 F.3d at 849; *Texas Gen. Petroleum Corp.*, 52 F.3d at 1339–40; *Sigmon*, 13 F.3d at 822–23; *Sacred Heart Hosp.*, 200 B.R. at 119. However, because Plaintiff waited until the eve of the expiration of the statute of limitations, *see* 11 U.S.C. § 546(a), to commence this adversary proceeding, I also find that Plaintiff is only entitled to recover prejudgment interest on the Alleged Transfers as of December 15, 2000, the date this action was commenced. Per Plaintiff's request, such interest shall be calculated using the applicable federal post-judgment interest rate provided for in 28 U.S.C. § 1961. *See, e.g., Brantley v. Weeks (In re Brantley)*, 116 B.R. 443, 448 (Bankr.D.Md.1990) ("Most federal courts which have addressed the issue of the applicable prejudgment interest rate in a case involving a federal question have used the applicable federal post-judgment interest rate pursuant to 28 U.S.C. § 1961.").

## CONCLUSION

For the reasons discussed above, I find that the Alleged Transfers constitute avoidable preferences pursuant to § 547(b), and that the value of such transfers is recoverable by Plaintiff pursuant to § 550. In addition, I also find that Plaintiff is entitled to recover post-judgment interest pursuant to 28 U.S.C. § 1961(a), along with pre-judgment interest calculated at the rate provided for in 28 U.S.C. § 1961(a) as it has accrued from December 15, 2000 until the date of the Order attached to this Memorandum Opinion.

## ORDER

For the reasons stated in the Court's Memorandum Opinion of this date, it is ORDERED that:

(i) $53,726.00 of the transfers ("Transfers") made by USN Communications, Inc. ("USN") to Worldnet Corporation ("Worldnet") within the ninety (90) days preceding February 18, 1999 are deemed avoidable and recoverable pursuant to 11 U.S.C. §§ 547(b) and 550;

(ii) Worldnet must pay an amount equal to the value of the Transfers to Scott Peltz, Trustee for the USN Communications Liquidating Trust ("Trustee");

(iii) Worldnet must pay the Trustee prejudgment interest on the amount of the

Transfers, as such interest has accrued from December 15, 2000, at the rate provided for in 28 U.S.C. § 1961(a)[1]; and

(iv) Worldnet must pay the Trustee post-judgment interest on the amount of the Transfers pursuant to 28 U.S.C. § 1961(a) as such interest shall continue to accrue from the date of this Order until the judgment provided for herein is satisfied.

---

1. 28 U.S.C. § 1961(a) provides for a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment as provided for in 28 U.S.C. § 1961(a).