524

In re WACCAMAW'S HOMEPLACE,
et al., Debtors.

Homeplace of America, Inc., on behalf
of all affiliated Debtors, Plaintiff,

v.

Salton, Inc., Defendant.

Bankruptcy No. 010181PJW.
Adversary No. 0207101PJW.

United States Bankruptcy Court,
D. Delaware.

May 31, 2005.

Laura Davis Jones, James E. O'Neill, Scotta E. McFarland, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, Andrew W. Caine, Harry E. Douglas, IV, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Los Angeles, CA, for Plaintiff HomePlace of America, Inc., et al.

Bruce E. Jameson, D. Benjamin Snyder, Prickett Jones & Elliott, P.A., Wilmington, DE, Dennis E. Quaid, Richard Chapman, William K. Carter, Fagel Haber, LLC, Chicago, IL, for Defendant, Salton, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This is the Court's ruling following a three-day trial on HomePlace of America, Inc.'s ("HomePlace") Code § 547 complaint against Salton, Inc. ("Salton") to recover $3,522,561.09 of transfers made during the preference period. For the reasons set forth below, the Court finds in part for HomePlace and in part for Salton.

## BACKGROUND

HomePlace and related entities operated super-stores for the home decor, housewares and furnishings marketplace offering a variety of brand name merchandise in a warehouse atmosphere.

In June 1999, HomePlace Holdings Inc. ("Holdings") and its subsidiaries HomePlace Management, Inc., HomePlace Stores, Inc. and HomePlace Stores Two, Inc. were acquired out of bankruptcy by Waccamaw Corporation ("Waccamaw"). Holdings, its subsidiaries and Waccamaw were concurrently merged into and became wholly owned subsidiaries of a newly created entity, HomePlace.

Salton is a vendor and manufacturer of small appliances, with its principal place of business in Lake Forest, Illinois. Through

its manufacture and sale of its products, Salton has done business primarily in the small appliance industry (the "Industry") beginning at least in 1986. Salton markets and sells its products globally through an internal sales force and a network of independent commissioned sales representatives.

HomePlace began ordering products from Salton in its own name in July 1999. HomePlace and Salton continued transacting business with each other through January 16, 2001 when HomePlace and its affiliates filed their chapter 11 petitions. Both a disclosure statement (Case Doc. # 1589) and a liquidation plan (Case Doc. # 1590) have been filed in the chapter 11 case. The amount available for distribution to unsecured creditors is likely to be nominal relative to the aggregate claims. Solicitation of votes for the plan has been held in abeyance pending the outcome of certain preference actions, including this one.

In 1999 and 2000, Salton's form of invoices called for HomePlace to make payments "net 30" days from the date of receipt of the goods or receipt of the invoice, whichever was later. In 2000, while Salton sold products to HomePlace on conventional "net 30" days terms, the parties also agreed to "Extended Dating" or "Big Buy" terms for certain sales transactions. In contrast to conventional payment terms such as "net 30" days or "net 60" days, an Extended Dating or Big Buy arrangement involves large purchases with payments to be made on an agreed specified date far beyond 30 or 60 days.[1] The terms for the Big Buy program in 2000 were discussed by Keith Hamden ("Hamden"), Vice President of Sales for Salton, Jim O'Brien ("O'Brien"), an independent sales representative for Salton, and Terry McAllister ("McAllister"), a buyer for HomePlace, at a meeting held at Salton's Illinois office in late April or early May 2000. The Big Buy called for "split dating", with 50% of the program to be paid on November 10, 2000 and the remaining 50% due on December 10, 2000. (Tr. 2, p. 97, l. 8–16.[2]) During the spring and fall of 2000 HomePlace purchased large quantities of product from Salton. Neither Salton nor HomePlace possess copies of the purchase orders for goods ordered by HomePlace from Salton. (Tr. 2, pp. 74, l. 25—75, l. 6.) Notwithstanding the parties understanding regarding the Big Buy transactions, all of Salton's invoices to HomePlace stated "net 30". According to Salton, this was because its computer-based system that produced the invoices could not accommodate the Big Buy arrangement.

During the ninety days preceding the petition date, HomePlace made payments to or for the benefit of Salton in the aggregate amount of $3,522,561.09. The specifics of the transfers are as follows:

| Check Date | Payment Date | Payment Amount | Receipt Date |
|---|---|---|---|
| 10/20/00 | 10/30/00 | $ 20,191.46 | 10/27/00 |
| 10/20/00 | 10/30/00 | $ 35,156.52 | 10/27/00 |
| 11/13/00 | 11/15/00 | $ 34,407.68 | 11/14/00 |
| 11/13/00 | 11/16/00 | $1,250,025.71 | 11/14/00 |
| 12/11/00 | 12/13/00 | $2,091,594.41 | 12/12/00 |
| 12/11/00 | 12/19/00 | $ 91,185.31 | 12/12/00 |
| | Total | $3,522,561.09 | |

Both at trial and in its post-trial response, HomePlace appears to have abandoned

---

1. The terms "Extended Dating" and "Big Buy" are used herein interchangeably.

2. As mentioned above, this opinion follows a three day trial that was held on November 1, 2, and 3, 2004. The docket numbers for the transcripts from the trial are as follows: doc. # 145 is 11/1/04; doc. # 128 is 11/2/04; and doc. # 127 is 11/3/04. In the interest of brevity, the Court will cite to the 11/1 hearing as "Tr. 1"; the 11/2 hearing as "Tr. 2"; and the 11/3 hearing as "Tr. 3".

any argument contesting that Salton established the affirmative defenses with respect to the four smaller payments. (Tr. 3, p. 121, l. 13–16; Doc. # 135, p. 13.) Consequently, this opinion will only address the two large payments, one in November ($1,250,025.71) and the other in December ($2,091,594.41).

With regard to these two payments, Salton's credit manager, Bruce Hofstetter ("Hofstetter"), testified at trial that around November 1, 2000 he sent a list of all outstanding invoices to HomePlace's account payables manager, Scott Raux ("Raux"), with the understanding that half would be paid on November 10, 2000 and half on December 10, 2000. (Tr. 2, p. 146, l. 1–15.) Raux confirmed that he had discussions with Hofstetter at the end of October regarding the invoices to be included in the November 10, 2000 payment. (Tr. 3, pp. 13, l. 22—14, l. 21.) On November 13, 2000, O'Brien picked up the check in the amount of $1,250,025.71 (the "November Payment") from HomePlace's headquarters in South Carolina.

After November 10, 2000 Hofstetter sent Raux a new list of invoices regarding the expected December 10, 2000 payment. (Tr. 2, p. 146, l. 16–19.) Raux confirmed that he had another conversation with Hofstetter in early December with regard to the invoices to be paid on December 10, 2000. (Tr. 3, p. 16, l. 6–18.) Raux also testified that he did not check to see if all the invoices listed were part of the Big Buy program and he did not challenge Hofstetter on the lists. (Tr. 3, pp. 26, l. 13—27, l. 10.) Raux merely sought some corrections on some of the invoices. (Tr. 3, p. 27, l. 4–8.) On December 11, 2000, Hofstetter picked up the check in the amount of $2,091,594.41 (the "December Payment") from HomePlace's headquarters in South Carolina.

At trial, Salton contested whether HomePlace had established all five elements of a preferential transfer under Code § 547(b). Salton also put on evidence that the transfers were shielded from avoidance as "ordinary course" transfers under Code § 547(c)(2) and because Salton provided "new value" pursuant to Code § 547(c)(4). Salton also asserts that the instant action is precluded by Code § 502(d) because of its allowed pre-petition claim in the amount of $210,327.18.

## DISCUSSION

■ Code § 547(b) provides five elements that must be established for HomePlace to avoid the November and December Payments. Because the parties have agreed three of the elements have been met, the contested elements are whether the transfers were:

(3) made while the debtor was insolvent; . . . and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). HomePlace bears the burden of establishing both of these elements. 11 U.S.C. § 547(g).

*Code § 547(b)(3)*

■ With regard to the issue of insolvency, in meeting this burden, HomePlace is afforded the benefit of Code § 547(f) pursuant to which "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f); *see also Bros. Gourmet Coffees,*

*Inc. v. Arm. Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 456, 458 (Bankr.D.Del.2002). "[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption . . . ." Fed.R.Evid. 301.[3] Therefore, unless Salton introduced some evidence at trial showing that HomePlace was solvent at the time the challenged transfers were made, HomePlace's burden has been met and Code § 547(b)(3) has been satisfied. *Peltz v. Worldnet Corp. (In re USN Communications, Inc.)*, 280 B.R. 573, 583–84 (Bankr.D.Del.2002) (citations omitted).

■ In relevant part, the Code defines insolvent as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). This Court has previously described the relationship between what must be established in a solvency examination and financial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP):

> Section 101(32) is often referred to as the "balance sheet" test of insolvency to distinguish it from the equity test, i.e., the inability to pay debts as they mature. To label it a "balance sheet" test may be a misnomer. Financial statements prepared in accordance with [GAAP] do not record assets at fair market value. Instead, they are recorded at the historical, original purchase cost and reduced each year by an estimate of depreciation. Within the contemplation of § 101(32) "property" may include assets not even listed on the balance sheet. Debts are recorded only to the extent they are known and quantifiable; many nonrecorded liabilities usually surface in an insolvency analysis. As demonstrated herein, the balance sheet is only the starting point in the analysis.

*Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 n. 22 (Bankr.D.Del. 1994) (internal citations omitted). The Court went on to specify that "[a]ccounting conventions are not the controlling principles for the legal determination of whether a debtor's debts exceed the fair value of its assets for purposes of insolvency." *Id.* at 410 (citing *In re F & S Cent. Mfg. Corp.*, 53 B.R. 842, 849 (Bankr.E.D.N.Y.1985) ("Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principals [sic],' do not necessarily reflect fair value: 'Generally accepted accounting principals [sic]' are not synonymous with any specific [valuation] policy.") (quoting *Pittsburgh Coke & Chem. Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir.1977)); *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 299 (Bankr.D.Mass.1983) ("[A]n asset entry on a balance sheet may not necessarily be an asset for the purpose of determining insolvency even though it may be an appropriate entry in accounting terms.")).

It is clear from the testimony of HomePlace's Chief Financial Officer, David Frost ("Frost"), that HomePlace was the product of a failed business plan. The merger in 1999 caused HomePlace to expend considerable time and money as it attempted to move forward as one entity. (Tr. 1, pp. 104, l. 12—106, l. 8.) HomePlace never showed a profit after the merger. (Tr. 1, p. 104, l. 7–9; Tr. 1, p. 109, l. 8–11.) HomePlace was a highly leveraged company after the merger. (Tr. 1, pp. 103, l. 20—104, l. 2.) HomePlace began to experience serious losses and cash flow became very tight in October of 2000. (Tr. 1, pp. 110, l. 17—111, l. 16.) This financial pre-

---

**3.** Made applicable to adversary proceedings by Rule 9017.

dicament caused HomePlace to begin stretching out its payment to vendors beginning in October of 2000. (Tr. 1, p. 111, l. 19–22.) Things became so dire that in November 2000 HomePlace hired PricewaterhouseCoopers to assist in pursuing a dual track of either preparing for a bankruptcy filing or obtaining an equity infusion to avoid a filing. (Tr. 1, pp. 113, l. 17—116, l. 2.) At the same time, other retailers were experiencing financial problems. (Tr. 1, p. 115, l. 4–9; Tr. 1, p. 120, l. 5–14.) The prospects for obtaining an equity infusion was slim at best. (Tr. 1, p. 120, l. 5–11.)

■ In support of its solvency argument, Salton offered into evidence HomePlace's monthly internally prepared operating reports (Def. Exhs. 10–14) and a financial disclosure statement filed by HomePlace with the Securities and Exchange Commission (Def. Exh. 16), all of which were prepared in accordance with GAAP. (Tr. 1, pp. 129, l. 1—130, l. 4.) As noted above, such financial statements are insufficient to rebut the Code § 547(f) presumption.

Salton offered no expert testimony on the issue of insolvency. Salton did offer the testimony of Salton's vice president for finance, Mr. William Lutz ("Lutz"). Lutz testified that in his opinion in the Fall of 2000 the value of HomePlace's inventory exceeded its liabilities. (Tr. 1, p. 83, l. 6–16.) Frost testified as to the shortcomings of Lutz's opinion. Specifically, Frost pointed out that Lutz's opinion was faultily premised on a liquidation of the inventory at regular retail prices and that Lutz ignored the impact of operating expenses in effecting a sale of the inventory over an extended period of time. (Tr. 1, p. 96, l. 6–21; Tr. 1, p. 97, l. 15–19; Tr. 1, p. 99, l. 1–21; Tr. 1, p. 101, l. 10–20.) Furthermore, Lutz conducted no meaningful assessment of HomePlace's liabilities, including, but

not limited to, off balance sheet liabilities (e.g., lease rejection damages). (Tr. 1, p. 87, l. 2–13.) Prior to becoming employed by Salton in March 2003, Lutz had no experience in the small appliance industry. And he has had no experience as an executive in a retail enterprise and has had no experience in conducting a going out of business sale in the retail industry. (Tr. 1, pp. 87, l. 14—88, l. 4.) Accordingly, I found Lutz's testimony on the insolvency issue to be superficial at best and insufficient to overcome the presumption or to rebut Frost's extensive testimony showing insolvency. (Tr. 1, p. 80, l. 3–13; Tr. 1, p. 182, l. 16–23.) I conclude that HomePlace was insolvent at the time of the subject transfers.

### Code § 547(b)(5)

■ With regard to the fifth element, "[c]ourts have consistently held that as long as the distribution in bankruptcy is less than 100 percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *Waslow v. Interpublic Group of Cos. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr.D.Del.2004) (citations omitted). In determining the amount of the payout in a bankruptcy case, the court may take judicial notice of the documents and events from the chapter case. *AFD Fund v. Transmed Foods, Inc. (In re AmeriServ Food Distribution, Inc.)*, 315 B.R. 24, 32–33 (Bankr.D.Del.2004).

HomePlace presented evidence that shows HomePlace has approximately $250 million of unsecured claims and an estimated $40,000 to $640,000 available to pay such claims. (Pl. Exh. 2; Tr. 1, pp. 167, l. 12—168, l. 1.) Exhibit 2 was derived from, and reflected little change from, the liquidation analysis presented in HomePlace's

disclosure statement (Case Doc. # 1517) filed with the Court on August 12, 2003. (Tr. 1, pp. 166, l. 16—167, l. 8.) Thus, even in the best case scenario and even if HomePlace recovered from Salton the amount asserted in the complaint, the payout to unsecured creditors would be nominal. Consequently, I conclude that Salton received more than it would have in a liquidation if the payment had not been made and, therefore, HomePlace has met its burden with respect to this element as well.

### Affirmative Defenses—Code § 547(c)(2)

■■■ Most of Salton's evidence was directed at the "ordinary course of business" defense provided by Code § 547(c)(2). Pursuant to Code § 547(c)(2), "[a] trustee may not avoid a preferential transfer to the extent such transfer was: '(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee; (B) made in the ordinary course of business or financial affairs of the debtor and transferee; and (C) made according to ordinary business terms.'" *United States Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir.1999) (quoting 11 U.S.C. § 547(c)(2)). "Combining the first two elements, the creditor must establish that the debt was typical to those that existed between the parties and that the corresponding payment was typical of their payment history." *Zeta Consumer Prods. Corp. v. Equistar Chem., LP (In re Zeta Consumer Prods. Corp.)*, 291 B.R. 336, 356 (Bankr.D.N.J.2003). In making the determination of what is subjectively ordinary between the parties, the Third Circuit has stated that "[f]actors such as timing, the amount and manner in which a transaction was paid are considered relevant." *First Jersey Sec.*, 180 F.3d at 512 (citation omitted). With regard to the third prong of Code

§ 547(c)(2), Salton must demonstrate that the payments were objectively ordinary for the Industry. *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 220 (3d Cir.1994).

It is clear that HomePlace and Salton had two separate payment arrangements during 2000. Accordingly, Salton separates the invoices that were paid by the November and December Payments into two groups: the ones subject to the Big Buy program (the "Big Buy Invoices") and the others that were subject to the standard "net 30" terms (the "Net 30 Invoices"). (Doc. # 141, p. 16.)

### The Big Buy Invoices

■■■ Considerable evidence was presented to demonstrate that there was a Big Buy program between the parties and that it was ordinary both between them and for the Industry. With regard to the existence of a Big Buy program, even though there was no documentation of the program (Hamden, Tr. 2, p. 84, l. 10–17; Tr. 2, p. 85, l. 1–5), Salton's Industry expert, Dennis Kennedy ("Kennedy"), testified that it is ordinary for parties in the Industry not to document Extended Dating programs. (Tr. 3, p. 185, l. 21–25.) Moreover, everyone at trial agreed Salton and HomePlace had a Big Buy program in 2000 with payments due on November 10 and December 10. (Johnson, Tr. 2, pp. 48, l. 21—49, l. 9; Hamden, Tr. 2, p. 69, l. 9–14; Frost, Tr. 2, p. 98, l. 5–14; Raux, Tr. 2, p. 118, l. 1–8; Hofstetter, Tr. 2, pp. 135, l. 10—137, l. 10; O'Brien, Tr. 2, pp. 189, l. 19—190, l. 8.)

The lack of a history of Big Buy terms between the parties is easily explained by the 1999 merger from which HomePlace emerged. Even so, one of HomePlace's predecessors, HomePlace Inc., had entered

into similar Big Buy programs with Salton for years. (Rue, Tr. 1, p. 203, l. 12–22; Raux, Tr. 2, pp. 120, l. 23—121, l. 14; Hofstetter, Tr. 2, p. 130, l. 12–25.) There was also some evidence presented that Waccamaw had previously entered into Big Buy programs with Salton. (Hamden, Tr. 2, p. 66, l. 17–25; Hofstetter, Tr. 2, p. 131, l. 17–21.) For these reasons, I do not attach any significance to the absence of a history of Big Buy deals between Home-Place and Salton, particularly in light of the common usage of Extended Dating programs in the Industry (discussed below).

With regard to Salton's behavior in picking up the checks for the November and December Payments, there are a number of factors that lead me to conclude that this was not unusual. First, Kennedy testified that it is ordinary course in the Industry for both independent sales representatives and credit managers to pick up checks from retailers. (Tr. 2, p. 30, l. 2–12; Tr. 2, p. 31, l. 2–9.) Second, O'Brien, the sales representative, testified, and Raux confirmed, that he had previously picked up checks from HomePlace on behalf of Salton and other vendors for whom he worked. (Raux, Tr. 2, pp. 123, l. 19—124, l. 8; O'Brien, Tr. 2, p. 199, l. 1–20.) Third, Hofstetter, the credit manager, testified that he had previously picked up checks from customers and that he had in fact picked up a check from HomePlace in December of 1999. (Tr. 2, p. 129, l. 13–14; Tr. 2, p. 133, l. 10–11.) O'Brien confirmed that Hofstetter frequently visited Salton's customers and that he was present at meetings in O'Brien's region. (Tr. 2, pp. 200, l. 22—201, l. 4.) Given the long period of time during which the invoices were outstanding and the size of the aggregate payables, it seems to me quite appropriate that payments might be picked up on the specific dates the parties had agreed upon months before.

There was evidence presented that it is ordinary within the Industry for retailers to receive calls before payments are due under a Big Buy arrangement. In this regard, Kennedy testified that, with respect to "dating terms", a credit manager would usually contact the buyer 20 to 30 days before the due date. (Tr. 2, pp. 28, l. 2—29, l. 5.) According to Kennedy, such action makes business sense because the invoices are outstanding for such a long period of time. (Tr. 2, pp. 28, l. 21—29, l. 3.)

As for whether the Big Buy itself was normal for the Industry, Kennedy testified that "extended terms", "dating terms" and "split billing" were ordinary in the industry. (Tr. 2, pp. 19, l. 18—21, l. 16; Tr. 2, pp. 23, l. 21—24, l. 17.) He stated that while dating terms could vary greatly, the hallmark of such programs is "shipping within a certain window of time with payment required on a specific date in time." (Tr. 2, p. 20, l. 8–11.)

O'Brien corroborated this in that, as an independent representative, he saw many "extended terms" between retailers and distributors. (Tr. 2, pp. 193, l. 18—194, l. 12; Tr. 2, p. 195, l. 18–20.) According to O'Brien, this type of arrangement is fairly standard in the Industry. (Tr. 2, p. 196, l. 7–11.)

Kennedy testified that having programs with payments due in the last part of the year makes sense because retailers generally do about 30 percent of their business in that time period. (Tr. 2, p. 22, l. 6–13.) On this point, there was evidence showing that the majority of retail business is done during the spring (around Mother's Day) and in the fall (mostly the time around Thanksgiving and Christmas). (Rue, Tr. 1, pp. 186, l. 1—187, l. 6.) Because of this, retailers like HomePlace and manufacturers like Salton utilize Big Buys in order to

stock merchandise for these seasons to bolster sales. (Rue, Tr. 1, pp. 200, l. 1—201, l. 4.)

For all of the above reasons, the Court finds that there were Big Buy terms between the parties and that such terms are ordinary for the Industry.

To establish which of the many invoices were Big Buy Invoices, Salton offered Hamden's testimony. Hamden reviewed all of the invoices that were the subject of the November and December Payments looking for factors indicating they were part of the Big Buy program. (Tr. 2, p. 74, l. 2–6; Tr. 2, p. 76, l. 6–23.) Such factors included intended ship dates, long cancellation dates, and large amounts of each invoice. (Tr. 2, pp. 76, l. 24—77, l. 10.) From this review, Salton created Defendant's Exhibit 7 identifying all of the invoices that Hamden determined were Big Buy Invoices. (Tr. 2, p. 76, l. 21–23.) HomePlace did not seriously contest this evidence and I conclude that Exhibit 7 identifies the Big Buy Invoices.

However, I find that Exhibit 7 contains a number of discrepancies as discussed below:

1. The exhibit consists of two pages listing all the Big Buy invoices followed by a copy of each invoice, lettered from A to II. Exhibit 7 purports to show that a total of $1,519,647.05 in Big Buy Invoices were paid by the November and December Payments. According to my calculations, the invoices listed on the first two pages of Exhibit 7 add up to only $1,436,253.70.

2. In addition, there is an invoice included in Exhibit 7, invoice number 724964 for $35,424, which the Court can only conclude is a duplicate of an invoice listed below it, invoice number 724965 for $35,424. The Court's attention was drawn to this invoice because there is not a corresponding copy of this invoice contained in

items A through II. Moreover, the duplicate invoice is not listed in the check remittances (Def. Exhs. 3 & 5) nor in Defendant's Exhibit 70, which purports to show all of the invoices paid during the preference period. Also, the duplicate invoice has the same bates number as the invoice listed below it. Therefore, I conclude that Salton's calculation should be reduced by $34,424.

3. Salton attached copies of two invoices that are not listed on the first two pages of Exhibit 7, invoice number 705813 in the amount of $83,393.28 (Item EE to Def. Exh. 7) and invoice number 702973 in the amount of $113,088. (Item II to Def. Exh. 7.) The Court reviewed the information on these two invoices and has determined that the lack of inclusion must be the product of clerical error because the invoices seem to meet the criteria discussed by Hamden. This conclusion is bolstered by the fact that both invoices were paid by the November check, which primarily paid Big Buy Invoices. Therefore, the Court concludes that Salton's Exhibit 7 calculation should include these two invoices.

Based on the above adjustments, the Court has determined that HomePlace paid $1,598,310.98 in Big Buy Invoices by the November and December Payments.

As HomePlace points out, the Big Buy Invoices were not in fact paid according to a 50/50 split. The November Payment paid $1,262,405.96 in Big Buy Invoices while the December Payment only paid $335,905.02. I do not attach much significance to this disparity. Hamden testified that "the big buy program was larger than [Exhibit 7]." (Tr. 2, p. 79, l. 9.) Exhibit 7 only represents the invoices for which Salton was able to present evidence that they were subject to the Big Buy arrangement. Both parties in this case acknowledge that

they engaged in "sloppy" business practices. (Frost, Tr. 3, p. 174, l. 2–7.)

I therefore conclude that the Big Buy terms and payments were ordinary course and that the aggregate amount of $1,598,310.98 paid on Big Buy Invoices identified by Salton in Exhibit 7 are not avoidable by reason of Code § 547(c)(2).

*The Net 30 Invoices*

■ As for the Net 30 Invoices paid by the November and December Payments, the salient factor in the ordinary course analysis is the timing of the payments. On this issue, Kennedy testified that the Industry norm was for non-Big Buy invoices to be paid 10 to 25 days late. (Tr. 2, p. 35, l. 11–16.) Thus, for a "net 30" days invoice the Industry norm for payment would be 40 to 55 days from the invoice date. To establish the pre-preference period practice between the parties, Salton submitted Defendant's Exhibit 71, which demonstrates that during a period of approximately one year preceding the preference period payments were made on average 18.9 days beyond the "net 30" terms. (Def. Exh. 71; Lutz, Tr. 2, pp. 151, l. 19—152, l. 25; Tr. 2, p. 156, l. 2–7.) In arriving at this figure, Salton assumed a due date for each invoice of 37 days after invoice date. (Lutz, Tr. 2, p. 152, l. 20–25.)

Defendant's Exhibit 70 was prepared in the same way and demonstrates that during the preference period payments were made on average 15.5 days late. (Def. Exh. 70; Lutz, Tr. 2, p. 154, l. 18–23; Tr. 2, p. 155, l. 20–23.) According to Salton, this fits within the Industry norm of 10 to 25 days late. However, I find that Exhibit 70 is misleading because it includes the Big Buy Invoices in calculating the average. The Big Buy Invoices are listed on

Exhibit 70 as having been paid 2 to 4 days after the agreed November 10 and December 10 payment dates, whereas the Net 30 Invoices on Exhibit 70 show the number of dates late from the 37 days after the invoice date. It does not make sense for Salton to shield the payments on the Big Buy Invoices as an alternative ordinary course arrangement and, in addition, include those invoices in a calculation of the average number of days late for the payment of Net 30 Invoices. Including the payment history of both types of invoices in a calculation to determine the average lateness of just one type produces a misleading result.

I have examined the list of invoices attached to the two checks (Def. Exhs. 3 & 5) and calculate that the Net 30 Invoices were paid an average of 77.3 days after invoice date. Thus, the payments were made an average of 47.3 days after the due invoice date. This is obviously beyond the 10 to 25 days that Kennedy testified to as being normal for the Industry and significantly beyond the 18.9 days that Salton's Exhibit 71 shows for the pre-preference period. The same result is reached even if the Court assumes a due date of 37 days past invoice date, which would mean the payments were made an average of 40.3 days late. Therefore, I find that with respect to the Net 30 Invoices, the aggregate payments of $1,743,309.14 were not made in the ordinary course and are not protected pursuant to Code § 547(c)(2).

*Code § 547(c)(4)*

■ Salton also asserts that the "new value" defense provided by Code § 547(c)(4) protects the November and December Payments.[4] The Third Circuit has

---

4. Code § 547(c)(4) provides:
(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such credi-

stated that three elements must be established for Code § 547(c)(4) to apply:

> First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

*New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),* 880 F.2d 679, 680 (3d Cir.1989) (emphasis in original) (citation omitted). "If the creditor satisfies these elements, a setoff is permitted in the amount of the new value and the recoverable amount is reduced." *TWA Inc. Post Confirmation Estate v. City and County of San Francisco Airports Comm'n (In re TWA Inc. Post Confirmation Estate),* 305 B.R. 221, 228 (Bankr.D.Del.2004) (citations omitted).

 The parties agree that Salton provided $284,497.82 in new value during the preference period that remained unpaid as of the Petition Date. (Doc. # 132 p. 39; Doc. # 135, pp. 37–8.) Therefore, under Third Circuit precedent, Salton is entitled to a setoff in this amount.

*Code § 502(d)*

 Salton also argues that the instant action is precluded by virtue of § 502(d) and *In re LaRoche Industries, Inc.,* 284 B.R. 406 (Bankr.D.Del.2002) (Akard, J.). According to this argument, because Salton's pre-petition claim was previously allowed in the chapter 11 case, HomePlace is now precluded from asserting an avoidance action against Salton. However, I

disagree with that application of § 502(d) and I previously found that allowance of a pre-petition claim does not preclude a later avoidance action. *See TWA Inc. Post Confirmation Estate,* 305 B.R. at 226–27. The fact that Salton's pre-petition claim was allowed earlier in the case has no bearing on HomePlace's ability to maintain the instant action.

### CONCLUSION

Based on the foregoing, Salton is entitled to protect a total of $2,063,749.77 from avoidance: $180,940.97 in payments because HomePlace effectively abandoned its contest as to them, $1,598,310.98 pursuant to Code § 547(c)(2), and $284,497.82 pursuant to Code § 547(c)(4). Therefore, of the $3,522,561.09 originally sought to be recovered by the Complaint, HomePlace is entitled to recover $1,458,811.32 as avoidable preferences.

### JUDGMENT ORDER

For the reasons set forth in the Court's memorandum opinion of this date, pursuant to 11 U.S.C. §§ 547 and 550, the Plaintiff is granted judgment in the amount of $1,458,811.32.

---

tor gave new value to or for the benefit of the debtor—
 (A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.